**BOWRING v. BOWERS, Collector of Internal Revenue.**

Circuit Court of Appeals, Second Circuit.
March 19, 1928.

No. 84.

1. Statutes ⬅219—Continuous construction by Treasury Department of word in income-tax acts must be adopted, where it was never questioned, and Congress amended act without defining word differently.

Continuous construction by Treasury Department of word used in income tax acts must be adopted by courts, except where text of statute furnishes cogent reason for departing from it, where such construction has never been questioned, and Congress has amended act without defining word in any different way.

2. Internal revenue ⬅7(36)—United States citizens domiciled elsewhere must pay income taxes on entire income.

Citizens of United States domiciled elsewhere are required to pay income taxes on their entire income, from whatever source derived.

3. Internal revenue ⬅7(27)—British subject, managing shipping company, but intending eventually to return to England, held "resident alien," within income tax law (Revenue Act Sept. 8, 1916 [39 Stat. 756], as amended by Act March 3, 1917 [39 Stat. 1000], as further amended by Act Oct. 3, 1917 [40 Stat. 300]; Revenue Act Feb. 24, 1919, §§ 210, 213 [Comp. St. §§ 6336⅛e, 6336⅛ff]; Revenue Act Nov. 23, 1921, § 213 [Comp. St. § 6336⅛ff]).

British subject, who expected to return to England at indefinite time in future, but who had spent periods aggregating 22½ years out of preceding 27 years in United States, and who was president of New York shipping business.

controlled by English firm, in which he was stockholder and director, *held,* "resident alien," within income tax law (Revenue Act Sept. 8, 1916 [39 Stat. 756], as amended by Act March 3, 1917 [39 Stat. 1000], as further amended by Act Oct. 3, 1917 [40 Stat. 300]; Revenue Act Feb. 24, 1919, §§ 210, 213 [Comp. St. §§ 6336⅛e, 6336⅛ff], Revenue Act Nov. 23, 1921, § 213 [Comp. St. § 6336⅛ff]), since, if alien lives in United States and has no definite intention as to his stay, he is resident, under Treasury Department regulations.

[Ed. Note.—For other definitions, see Words and Phrases, Resident Alien.]

In Error to the District Court of the United States for the Southern District of New York.

Action by Charles W. Bowring to recover income taxes from Frank K. Bowers, a Collector of Internal Revenue, which were paid under protest and are alleged to have been illegally exacted. On a motion on behalf of the defendant for the direction of a verdict in his favor, the direction was granted. Judgment was thereupon rendered for the defendant, and plaintiff brings error. Affirmed.

The complaint embraces five causes of action to recover income taxes alleged to have been wrongfully exacted for the years 1917, 1918, 1919, 1920, and 1921, upon income received by plaintiff from sources outside the United States. The taxes were levied upon the theory that plaintiff was during these years a resident alien, and the question is whether he was such a resident within the meaning of the Revenue Acts.

The plaintiff was born in St. Johns, Newfoundland, of parents who were also born there. In 1884, when 13 years of age, he was sent to school in England for 4½ years. On the death of his father, in 1890, he entered the family business in England, which was then a partnership conducted under the name of C. T. Bowring & Co. Two years later the rest of his family decided to give up their Newfoundland home and move to England. The family house in St. Johns, Newfoundland, was sold, and the plaintiff and his mother, after living for a few months in a rented house in Liverpool, purchased an estate there as trustees under his father's will, which was known as Chiselhurst. All the family moved to it, and plaintiff had his own quarters in the house. He testified that, with the rest of the family, he went to England, intending to make that his home, and regarded Chiselhurst as his permanent home, and had never had any intention of changing it, until he had to go to London and lived there after the bringing of this action. He was living at Chiselhurst when he first came to the United States in 1895, and retained his personal quarters there up to the time of his mother's death in 1925. He occupied them with his family whenever he returned to England, had a suite there, furnished with furniture which he had himself purchased, and contributed toward the upkeep of the house. Between the years 1895 and 1922, however, he spent the greater part of his time in the United States. Out of that interval of 27 years, periods aggregating about 22½ years were spent in the United States and something over 4 years in England. His stays in the United States averaged less than 4 years, and those in England 4 or 5 months, at a time.

In 1900, plaintiff married a native of Staten Island, New York, and after his marriage usually had two houses in this country, one in Manhattan, and the other in Staten Island. From about 1901, while in Manhattan, he lived in leased houses until 1919, when he purchased No. 160 East Seventy-Fourth street, which he had for some time before occupied under lease.

The Bowring business covered diversified activities—insurance, export and import business, and general trading. It had lines of steamers operating between the Canadian ports, and tank and tramp steamers running between various parts of the world, and also embraced steamship agencies.

The principal houses in the Bowring business were at Liverpool, London, New York, and St. Johns, Newfoundland, and, prior to 1900, there were three firms, with headquarters in England, Newfoundland, and New York, respectively. Thereafter the firms were incorporated, and the English company held substantially all the stock of the New York and Newfoundland companies which owned the business in those places. The business was founded by the plaintiff's great-grandfather and it remained a family affair. It was the custom to give an interest in the business to a younger son after he had served his apprenticeship, and this happened to the plaintiff. In every generation since the business was founded, it had been the practice to send out the younger members of the family to conduct the foreign branches of the business, but with the exception of the plaintiff's father, who died at only 50 years of age, in Newfoundland, they all finally returned to England, and this the plaintiff said he expected to do ultimately. While, from long experience here, he especially fitted into the New York business and became finally its president, he was also a

stockholder and director in the English company, which practically owned the New York and Newfoundland business. In his wills he described himself as of the city of Liverpool, as he frequently did in baggage declarations for the customs. He remained a British subject, and his five children, though born in this country, were registered by him as British subjects. In four deeds, however, he was described as residing at 160 East Seventy-Fourth street, New York, and he was described in a similar way in the certificate of incorporation of the New York business, as well as in an application for life insurance. He and his witnesses, however, testified to facts tending to show a purpose to retain Chiselhurst as his home, and not to abandon that domicile, and to return there to live at some future indefinite time, when those in control of the British holding company should call him back to England, as the British partners or officers had called the other Bowrings in the past. In 1922, the plaintiff went to England, thinking that his removal was to be permanent. He sold his house in Seventy-Fourth street, and placed his Staten Island house in the market, but apparently has returned. There can be no doubt that, in spite of his long stay in this country, his connections—family, social, and business—were at all times peculiarly British.

Upon a record, of which the foregoing is a summary, Judge Grubb, who presided at the trial, expressed the opinion that the plaintiff had acquired a New York domicile, when "he came here intending only to return in the event that his partners called on him to return," though he did not place his decision on that ground. He held that, since upon the undisputed evidence the plaintiff had stayed in New York for over 20 years, with an intention to remain indefinitely, he was a resident alien within the meaning of the Revenue Acts, and was subject to taxation as such. He accordingly directed a verdict for the defendant, saying to the jury:

"I have decided as a matter of law that the statute means 'residence,' and not what is called 'domicile' in the law, and that Mr. Bowring was a permanent resident of this country at the time the tax was imposed, and therefore was subject to the tax. * * *"

It is a fact that the ruling that plaintiff is taxable on all his income wherever derived is a severe one for him. Most of his income, outside of his salary paid in New York, which was returned for taxation here, consisted of dividends from his stock in the British holding company. These were already depleted by corporation taxes on income and excess profits paid by the New York corporation, and to these were added large taxes paid by the British Company in England.

Cohen, Gutman & Richter, of New York City (Julius Henry Cohen, Kenneth Dayton, and William Victor Goldberg, all of New York City, of counsel), for plaintiff in error.

Charles H. Tuttle, U. S. Atty., of New York City (Thomas J. Crawford and Frank Chambers, Asst. U. S. Attys., both of New York City, of counsel), for defendant in error.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge (after stating the facts as above). It may be doubted whether, in view of such cases as Winans v. Attorney General, [1904] A. C. 287, Depuy v. Wurtz, 53 N. Y. 556, and McDonald v. Hartford Trust Co., 104 Conn. 169, 132 A. 902, the plaintiff did not retain his English domicile. The testimony indicates a desire on his part to do this, and while a purpose to retain his original status would not alone be enough to prevent the acquisition of a domicile of choice, unless (in spite of his long abode in New York) he still intended England to be his real home, and did not intend to reside permanently, or for an indefinite period, in the United States (Williamson v. Osenton, 232 U. S. 619, 34 S. Ct. 442, 58 L. Ed. 758; Gilbert v. David, 235 U. S. 561, 35 S. Ct. 164, 59 L. Ed. 360), yet there is some basis for the claim that his intention to return to England, when recalled by his company, and his expectation that he would be so recalled, prevented the acquisition of a domicile in New York (Dicey [3d Ed.] p. 113). The determining question here would seem to be whether the intention to return was so contingent or fleeting as to amount to little more than a hope or reasonable possibility (Attorney General v. Pottinger, 30 L. J. Ch. Ex. at p. 294; United States v. Knight [D. C.] 291 F. 129; aff'd [C. C. A.] 299 F. 571), or whether, on the contrary, the intention was capable of probable fulfillment.

But all the limitations applicable to acquiring a new domicile, particularly when a domicile of national origin is to be abandoned, do not necessarily attach to taking out a new residence, either in this country or England. The United States Income Tax Acts, from the act of 1913 (38 Stat. 114) on, have been uniform in levying a tax on the

entire income of aliens, if resident here, and residence has been construed by the Commissioner in all his rulings as something which may be less than a domicile, which fixes the law of the devolution of property and determines the incidence of estate and succession taxes. It is true that "residence" is ordinarily used as the equivalent of domicile in statutes relating to probate, administration, and succession taxes. So, as might be expected, in the Revenue Acts, the word "resident," when employed in the portions of these acts dealing with the Estate Tax Law, means "domiciled," and has been so construed by the practice and regulations of the department.

It is contended that the same words, when used in the titles of the same acts dealing with the income tax, must have the same meaning. But the estate tax provisions were first introduced in the Revenue Act in 1916 (39 Stat. 756), after the construction of the word "resident" in that act had already become fixed by the ruling of the department at least as early as Treasury Decision 2242 of September 17, 1915, infra. Moreover, the incidence of estate and succession taxes has historically been determined by domicile and situs, and not by the fact of actual residence. Frick v. Pennsylvania, 268 U. S. 473, 45 S. Ct. 603, 69 L. Ed. 1058, 42 A. L. R. 316. As Justice Holmes said in Bullen v. Wisconsin, 240 U. S. at page 631, 36 S. Ct. 474 (60 L. Ed. 830):

" * * * As the states where the property is situated, if governed by the common law, generally recognize the law of the domicile as determining the succession, it may be said that, in a practical sense at least, the law of the domicile is needed to establish the inheritance. Therefore the inheritance may be taxed at the place of domicile, whatever the limitations of power over the specific chattels may be. * * * "

As was said, also, in the Matter of Martin, 173 App. Div. at page 3, 158 N. Y. S. 916:

" * * * in many instances there is a difference between the legal intendment of the terms 'residence' and 'domicile' * * * but in the matter of succession and transfer taxes the theory of the action of the taxing power renders the terms synonymous. In the case of succession the intestate's personalty is distributed according to the Statute of Distributions of the State of the domicile. Therefore, that State which permits the inheritance is entitled to impose a duty on that privilege. * * * "

24 F.(2d)—58½

But in personal and income taxes domicile has played no necessary part, and residence at a fixed date has determined the liability for the tax. Bell v. Pierce, 51 N. Y. 12; Douglas v. Mayor, 9 N. Y. Super. Ct. 110; Matter of Austen, 13 App. Div. 247, 42 N. Y. S. 1097; Finley v. Philadelphia, 32 Pa. 361. In the New York Income Tax law (Consol. Laws, c. 60), which is largely based on the federal acts, section 350 defines a "resident" as "any person domiciled in the state of New York, and any other person who maintains a permanent place of abode within the state, and spends in the aggregate more than seven months of the taxable year within the state."

Likewise under the English income tax laws, prior to 1914, residence, and not domicile, was the test of liability (Inland Revenue v. John Lambert Caldwalader, [1904] 7 Session Cases, 146; Attorney General v. Coots, 4 Price, 183), though income, unless derived from a trade or employment carried on in England, had to be received there in order to render one subject to taxation upon it (Liverpool, London & Globe Ins. Co. v. Bennett, [1913] A. C. 610). But since 1914 a resident of more than six months (though not domiciled) has had to pay an income tax on all income received in the United Kingdom, and a domiciled person a tax on income derived from all sources. Thus, under all the British income tax laws, a resident, though having no domicile in England, had to pay a tax on all income received in England whatever its source. Whether he received all his income there, of course, depended on circumstances, but whatever he received was taxable against a resident, irrespective of his domicile.

In the federal act of 1913, income taxes are imposed upon "the entire net income arising or accruing from all sources in the preceding calendar year to every citizen of the United States, whether residing at home or abroad, and to every person residing in the United States, though not a citizen thereof, * * * and a like tax shall be assessed, levied, collected, and paid annually upon the entire net income from all property owned and of every business, trade, or profession carried on in the United States by persons residing elsewhere." 38 Stat. 166.

The Treasury Department made its ruling as to the meaning of "residing" in the foregoing act in Treasury Decision 2242, in which occurred the following language:

" 'Residence,' as used in subdivision 1 of

paragraph A of the Act of October 3, 1913, and T. D. 2109, is held to be—

"That place where a man has his true, fixed, and permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning, and indicates permanency of occupation as distinct from lodging or boarding or temporary occupation.

"For the purposes of the income tax it is held that where for business purposes or otherwise, an alien is permanently located in the United States, has there his principal business establishment, and is there permanently occupied or employed, even though his domicile may be without the United States, he will be held to be within the definition of 'every person residing in the United States, though not a citizen thereof, * * *' while aliens who are physically present in the United States but only temporarily resident or employed therein (as for a season or other similarly definite term, and with the expectation or intention of leaving the United States upon the termination of employment or accomplishment of the purpose which necessitated presence in the United States) are within the class of 'persons residing elsewhere. * * *'"

The Revenue Act of September 8, 1916, chapter 463 (39 Stat. 756), as amended by the Act of March 3, 1917 (39 Stat. 1000), as further amended by the Act of October 3, 1917 (40 Stat. 300), provides in part:

"Sec. 1. (a) That there shall be levied, assessed, collected, and paid annually upon the entire net income received in the preceding calendar year from all sources by every individual, a citizen or resident of the United States, a tax of two per centum upon such income; and a like tax shall be levied, assessed, collected, and paid annually upon the entire net income received in the preceding calendar year from all sources within the United States by every individual, a nonresident alien, including interest on bonds, notes, or other interest-bearing obligations of residents, corporate or otherwise.

"(b) In addition to the income tax imposed by subdivision (a) of this section (herein referred to as the normal tax) there shall be levied, assessed, collected, and paid upon the total net income of every individual, or, in the case of a nonresident alien, the total net income received from all sources within the United States, an additional income tax (herein referred to as the additional tax). * * *" Comp. St. § 6336aa.

The corresponding sections of the Revenue Act of February 24, 1919 (40 Stat. 1057 [Comp. St. § 6336⅛e]), read:

"Sec. 210. That, in lieu of the taxes imposed by subdivision (a) of section 1 of the Revenue Act of 1916 and by section 1 of the Revenue Act of 1917, there shall be levied, collected, and paid for each taxable year upon the net income of every individual a normal tax at the following rates:

"(a) For the calendar year 1918, 12 per centum of the amount of the net income in excess of the credits provided in section 216: Provided, that in the case of a citizen or resident of the United States the rate upon the first $4,000 of such excess amount shall be 6 per centum;

"(b) For each calendar year thereafter, 8 per centum of the amount of the net income in excess of the credits provided in section 216: Provided, that in the case of a citizen or resident of the United States the rate upon the first $4,000 of such excess amount shall be 4 per centum."

Section 213 (Comp. St. § 6336⅛ff) contains the following provision:

"(c) In the case of nonresident alien individuals, gross income includes only the gross income from sources within the United States, including interest on bonds, notes, or other interest-bearing obligations of residents, corporate or otherwise, dividends from resident corporations, and including all amounts received (although paid under a contract for the sale of goods or otherwise) representing profits on the manufacture and disposition of goods within the United States. * * *"

In the Revenue Act of 1921 (42 Stat. 227 [Comp. St. § 6336⅛e]) we find:

"Sec. 210. That, in lieu of the tax imposed by Section 210 of the Revenue Act of 1918, there shall be levied, collected, and paid for each taxable year upon the net income of every individual a normal tax of 8 per centum of the amount of the net income in excess of the credits provided in section 216: Provided, that in the case of a citizen or resident of the United States the rate upon the first $4,000 of such excess amount shall be 4 per centum."

Section 213 (Comp. St. § 6336⅛ff) defines gross income in the case of various classes of taxpayers, and subdivision (c) reads:

"(c) In the case of a nonresident alien individual, gross income means only the gross income from sources within the United States, determined under the provisions of section 217."

We are referred to no formal ruling of the Treasury Department after Treasury Decision 2242, until article 312 of the Regulation promulgated under the 1919 act, which was as follows:

"Art. 312. Who is a Nonresident Alien Individual.—'Nonresident alien individual' means an individual (a) whose residence is not within the United States and (b) who is not a citizen of the United States. Any alien living in the United States who is not a mere transient is a resident of the United States for purposes of the income tax. Whether he is a transient or not is determined by his intentions with regard to his stay. If he lives in the United States and has no definite intention as to his stay, he is a resident. The best evidence of his intention is afforded by the conduct, acts and declarations of the alien. The typical transient is one who stops for a short time in the course of a journey through the United States, sometimes performing labor, sometimes not, or one who enters the United States intending only to stop long enough to carry out some purpose, object or plan not involving an extended stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient.".

Under the act of 1921, Regulation 62 was promulgated, which provides as follows:

"Art. 311. Who is a Nonresident Alien. —A 'nonresident alien individual' means an individual (a) whose residence is not within the United States and (b) who is not a citizen of the United States. An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient or not is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned."

[1, 2] Such a continuous construction of the word "resident" ever since the passage of the Income Tax Act of 1913 would in any case have great weight under well-known principles. But to this is added the fact that this construction has, so far as we are informed, never before been questioned during all these years, and Congress has again and again amended the act without defining the word in any different way. In such circumstances, the departmental construction, except where the text of the statute furnishes cogent reason to depart from it, must be adopted by the courts. National Lead Co. v. United States, 252 U. S. 140, 40 S. Ct. 237, 64 L. Ed. 496; Heiner v. Colonial Trust Co., 48 S. Ct. 65, 72 L. Ed. ——; Robertson v. Downing, 127 U. S. 607, 8 S. Ct. 1328, 32 L. Ed. 269. Moreover, the hardship of the double taxation would have been prevented by reason of section 222 (a) (3) of the Revenue Act (Comp. St. § 6336⅛k), if Great Britain, the country of which the plaintiff is a citizen, had allowed to citizens of the United States residing there a credit of taxes paid by them in the United States upon their taxes paid in Great Britain, but there has been no such reciprocal legislation. In the case of our own citizens domiciled elsewhere, we exact income taxes upon their entire income, from whatever source derived. Cook v. Tait, 265 U. S. 47, 44 S. Ct. 444, 68 L. Ed. 895. While this legislation is severe, and as a matter of economic policy may not be sound, it is hard to see why aliens who have acquired a fixed abode here should fare better. Our citizens domiciled abroad would be generally subjected to a tax on all their income by the country in which they live, and even when living in England only six months are liable to pay taxes on all income received there.

[3] But, in any event, we are bound by the long unquestioned construction of the term "residence" by the department charged with the administration of the Revenue Acts. The word is fairly capable of the meaning they have given to it and has often received that interpretation in income tax legislation from the earliest times. Mr. Bowring acquired an abode here of no transient character and so long continued, and so substantial, as to be of a permanent nature. He certainly became a resident within the meaning of the departmental regulations. We hold these valid, and, under all the circumstances, binding upon the courts and accordingly affirm the judgment.