OPINION. The Domicile Issue ARUNdell, Judge: The parties are in agreement on the basic premise that the amount of the estate tax on the estate of the decedent is dependent, in part, upon whether or not the decedent was domiciled in the United States at the date of his death.[1] This agreement of the parties is in accordance with the respondent’s regulations which provide that “A resident is one who, at the time of his death, had his domicile in the United States * * *. All persons not residents of the United States as above defined * * * are nonresidents.” Section 81.5, Regulations 105. The parties are also in agreement on the fact that the decedent was born in The Netherlands and throughout his life, and at the time of his death, was a citizen of The Netherlands. In view of the agreement of the parties on these points, our immediate question is whether the decedent’s domicile at the time of death was in the United States as determined by the respondent. We start with the fundamental principle that “a domicile once acquired is presumed to continue until it is shown to have been changed.” Mitchell v. United States, 88 Wall. 850. There is no question about the decedent having been domiciled in The Netherlands prior to the year 1940 when he left there on a business trip and his return thereto was prevented by the invasion of his country by enemy forces. In the light of the presumption of continued Dutch domicile, the facts must be examined to determine whether in or after 1940 any events occurred which result in overcoming that presumption. The opinion in the case of Mitchell v. United States, supra, gives as guides these principles: To constitute the new domicile two things are indispensable: First, residence in the new locality; and, second, the intention to remain there. The change cannot be made except facto et animo. Both are alike necessary. Either without the other is insufficient. Mere absence from a fixed home, however long continued, cannot work the change. There must be the animus to change the prior domicile for another. Until the new one is acquired, the old one remains. These principles are axiomatic in the law upon the subject. The quoted principles are the basis of the respondent’s approach to the problem. He states in his brief that “The two components, factum and cmirrms, must concur in order to effect a change of domicile.” Although the decedent’s failure to return to Holland in 1940 was forced upon him by circumstances beyond his control, the fact is that he did reside in the United States for nearly six years. Thus, the first of the two components that are relied on by the respondent— the factum — must be recognized as having existed. As to the second factor — “the animus to change the prior domicile”— there is not only no sufficient evidence to overcome the presumption that Holland continued to be the country of his domicile, but there is abundant evidence to establish that no new domicile was acquired in the United States. We have set out some of the facts upon which is based our ultimate finding that the decedent’s domicile was in The Netherlands. An examination of all of the evidence, particularly the testimony of persons who were well acquainted with the decedent, leaves upon our minds a clear picture of a man who was unhappy about his enforced absence from his domicile and who intended to return to that domicile when circumstances made it possible and practicable to do so. He had an established business in Holland, which had been founded by his father, and which he wanted to carry on. His association with Duys & Co. was that of an employee, which was a far cry from the executive position of directing the business of his own corporation. He had in Holland a large home on extensive grounds, in which he and his wife had entertained on a large scale. In this country he lived in small apartments which were not at all suited to his customary way of living. The respondent points out that the decedent had sufficient income to have warranted the decedent’s occupancy of more sumptuous quarters. His failure to do so is in keeping with his expressed view that his stay in the United States was only temporary. Other members of his family were in Holland and the decedent was concerned about their welfare. There is no evidence that he had any relatives in this country. The respondent calls attention to certain statements made by the decedent in forms pertaining to his quota immigration visa. In reply to a question as to his “present permanent residence address” the decedent gave the address of the New York apartment that he was occupying at that time. One of the forms that the decedent signed contained the printed statement that “I intend to remain_ -” Under the blank space were the words: “(Permanently or length of time).” The decedent inserted the word “permanently” in the blank space. The statements in the forms were made in the early part of the year 1941, at which time no one could prophesy with any assurance the length of the decedent’s enforced absence from his homeland which was then in enemy hands and his Government was in exile. The forms did not provide space for any extended explanation. Even so, if we consider the statements as indicating actual residence in the United States, they do not establish domicile upon which “the incidence of estate and succession taxes has historically been determined.” Bowring v. Bowers, 24 F. 2d 918, certiorari denied 277 U. S. 608; Frederick Rodiek, supra. “Residence without the requisite intention to remain indefinitely will not suffice to constitute domicile * * *.” Section 81.5, Regulations 105. Neither do we regard with any significance the decedent’s filing of resident income tax returns. Residence has a different meaning in the income tax provisions of the Code than it has in those relating to estate tax. For income tax purposes, an alien in the United States “who is not a mere transient or sojourner is a resident” and must file returns. Section 29.211-2, Regulations 111, quoted with approval in Commissioner v. Nubar, 185 F. 2d 584. The evidence supports the presumption of continuance of original domicile and overcomes the presumption of the correctness of the respondent’s determination. It is accordingly held that the respondent erred in his determination that the decedent was a resident of the United States at the time of his death. Value of Stock of H. Duys <& Co., Inc. The decedent owned 1,096 shares of the common stock of Duys & Co. at the time of his death. The shares were reported in the estate tax return at a value of $126,040, which is at the rate of $115 per share at the optional valuation date. The respondent determined a value of $189,257.28, or $172.68 per share, and by amendment to his answer he alleges that the shares had a value of $312,360, i. e., $285 per share, and claims a consequent increase in the deficiency. Duys & Co. was a closely held corporation. All of its common stock was held by the Duys and Menhuys families. In 1947 all voting rights were in the common stock. As is usual in cases of valuation of stock of closely held corporations, each party has introduced evidence of the existence of factors which, standing alone, supports his position. The petitioner places stress on factors which would tend to make the stock unattractive to prospective investors and to depress the value. Examples of these are that the stock owned by the decedent was a minority interest — some 18 per cent of the common — and could not control corporate policy. Its operations were confined to growing, purchasing and selling leaf tobacco for use in cigars. It did not do any manufacturing in which respect it differed from some of the better known tobacco companies, nor did it deal in cigarette tobacco except as to a minor part of its Cuban tobacco. The operating and financial policies of the corporation were dictated by one man, Henry M. Duys, who was 62 years of age at the optional valuation date. The corporation did not carry insurance on the life of Mr. Duys. The major basis of the business since its inception in 1900 had been the importation and sale of Sumatra and Java tobacco, and that part of the business was sharply curtailed if not entirely lost when enemy forces overran the Pacific islands in World War II. Its enforced change to the growing of domestic tobaccos was a costly and precarious venture. On the other hand, the respondent points to the financially successful operations of the business over a long period of years, with emphasis on operations in the 10-year period covered by the fiscal years ended March 31, 1938 to 1947, inclusive. Although no far-eastern crops of tobacco were grown in the war period after the crop of 1941, Duys & Co. was able to procure some Sumatra and Java tobacco from the inventory of another company throughout the war period. During the period of scarcity of far-eastern tobacco, domestic cigar manufacturers became accustomed to using Connecticut shade tobacco for wrappers and were satisfied to use that tobacco. Dealings in Connecticut tobacco resulted in a loss of some $1,600 in 1941, but thereafter such dealings were profitable, with a profit of over $364,000 in 1946 and $276,000 in 1947. Operations in other tobaccos, including those of Puerto Rico, Cuba, and Florida, throughout the 10-year period resulted in an over-all profit'in each of those years. Income per common share, with the exception of 1938, was substantial, ranging from a low of $7.18 to a high of $45.63. In the valuation year, 1947, earnings per common share amounted to $17.02. While the number of cigar factories had decreased considerably over a period of years prior to 1947, the per capita consumption of cigar tobacco had remained steady in the 10 years ending in 1947 and the number of cigars produced in 1947 was 470,000,000 greater than in 1938. We have examined and weighed all of the evidence bearing on the value of the common stock of Duys & Co. Based upon our consideration of that evidence, and a weighing of the factors established by it, we have reached the conclusion and have found as an ultimate fact that the value of the common stock at April 8, 1947, was $172.68 per share. The evidence does not establish a lower value contended for by the petitioner or a higher value asserted by the respondent by amendment to his answer. The respondent’s inclusion of the stock in gross estate at a value of $172.68 per share is sustained. Valuation of Property Outside the United States/ Accrued Dividends The respondent has included in the gross estate the value of personal property that he determined was located in The Netherlands, including stocks in American corporations. It developed at the hearing that certificates for some stocks in foreign corporations, and some bank accounts of the decedent, were located in foreign countries other than The Netherlands. Based upon our. conclusion that the decedent was not a resident of the United States, the greater portion of the personal property located outside the United States is not to be included in the gross estate. For estate tax purposes, stock of domestic corporations owned by a nonresident not a citizen of the United States is deemed to be property within the United States. Internal Revenue Code section 862 (a). Code section 861 (a) (1) requires an apportionment of deductions in such a case as this. For these reasons it is necessary to determine the value of such of the decedent’s shares of stock in American corporations as were not included in the estate tax return and also the value of other of the decedent’s properties, other than real estate. There is no dispute between the parties as to the value in Dutch guilders of the decedent’s property in The Netherlands and other foreign countries, and the shares in American corporations and accrued dividends thereon represented by certificates issued by the Dutch Administration Offices. The parties present the question to be decided as to such properties as one to be determined by the effect on such value of the blocking restrictions imposed by the government of The Netherlands under the 1945 decree on transactions involving foreign exchange. This presentation of the question stems from the fact that the estate tax, like its companion gift tax, is based on the value of property measured in terms of United States dollars. Estate of Anthony H. G. Fokker, 10 T. C. 1225, Morris Marks Landau, 7 T. C. 12. Both parties take extreme views as to the effect of the decree of The Netherlands government. The petitioner contends that under the decree the property could not have been sold for United States dollars and therefore it had no value for estate tax purposes. The respondent’s position is that the official exchange rate of $0.37695 per guilder should be used, as the valuation date is subsequent to the date of the liberation of The Netherlands and foreign trade had revived at the valuation date. The evidence, as we analyze it, does hot support the position of either party to the extent that each, respectively, claims. While Holland had been liberated from the hands of the enemy, and we assume that there had been a revival of foreign trade, at least to some extent, nevertheless there was in effect the governmental decree imposing restrictions on the sale of property of Dutch nationals in foreign exchange. The effect of such restrictions must be taken into account in determining value. Morris Marks Landau, supra. The evidence establishes that at the optional valuation date the decedent’s estate could not have realized in dollars the full guilder value of the blocked properties converted at the official rate of exchange. There is evidence that as to stocks in American corporations owned by Dutch nationals, the certificates for which were in this country, the market price was only about one-half of the guilder value at the official exchange rate. The petitioner’s evidence establishes to our satisfaction that the respondent erred in converting guilder values into dollar values at the official exchange rate. However, it is not convincing that the properties involved in this issue had no value at all. The foreign exchange decree does not purport to be an absolute prohibition on transactions involving foreign exchange. The decree made it illegal to dispose of property in foreign trade “otherwise than by virtue of a license.” There is no evidence that the decedent’s estate made any effort to procure a license. There is evidence that property of Dutch nationals could not have been sold for free United States dollars, but there is also evidence that some foreign transactions were permitted if the proceeds were offered to The Netherlands Bank in exchange for guilders. While this no doubt involved some financial sacrifice on the part of the Dutch national, we cannot find as a fact that the property in the decedent’s estate could not have been converted into United States dollars at some figure. The existence of the foreign exchange controls imposed by The Netherlands makes it difficult to fix an exact value for the property outside the United States, but some value must be determined under the estate tax provisions of the taxing statute. Ithaca Trust Co. v. United States, 279 U. S. 151. Our best judgment, based upon all the evidence, is that the decedent’s property in The Netherlands should be valued at the optional valuation date by converting the guilder value into United States dollars at the rate of $0.10 per guilder. Life Insurance As the decedent was not a resident of the United States, the proceeds of the policy of insurance on his life are not includible in the estate. Code section 863 (a). Administration Expenses The parties have stipulated as to the deduction allowable to the estate for attorneys’ fees and related expenses and disbursements incurred in the administration of the estate and in this proceeding or on a review, Decision will he entered under Bule 50. Section 811 of the Internal Revenue Code, defining “gross estate,” makes no distinction based on residence, nonresidence, or domicile. However, other provisions of the Code relating to deductions and exemptions, and the respondent’s Regulations, have the effect of limiting the tax to the transfer of only so much of the estate of a nonresident as constitutes property within the United States. This subject was fully explored in the case Frederick Rodiek, Ancillary Executor, 33 B. T. A. 1020, affd. on other points, 87 F. 2d 328, which arose under the Revenue Act of 1926.