T.C. Memo. 1998-22

UNITED STATES TAX COURT

ESTATE OF BARKAT A. KHAN, DECEASED, MOHAMMED ASLAM KHAN,
EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6580-95.                          Filed January 20, 1998.

John L. Burghardt, for petitioner.

Robert E. Cudlip, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, Judge: Respondent determined a deficiency of

$179,278 in petitioner's Federal estate tax. After concessions

by petitioner,[1] the sole issue for decision is whether decedent,

---

[1] Petitioner has stipulated that it is not entitled to a
marital deduction of $7,000 or additional Schedule J expenses of
(continued...)

Barkat A. Khan, was a resident of the United States at the time of his death. If decedent was a resident of the United States at the time of his death, petitioner is subject to the Federal estate tax imposed on the estates of U.S. residents under section 2001[2] and is entitled to the unified estate and gift tax credit of $192,800 allowed under section 2010. If decedent was a nonresident at the time of his death, petitioner is subject to the Federal estate tax imposed on the estates of noncitizen nonresidents under section 2101 and is entitled to a unified credit of $13,000 under section 2102(c)(1).

## FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Decedent, Barkat A. Khan, died in Pakistan on February 25, 1991. Decedent's son Mohammed Aslam Khan (Aslam) is the executor of decedent's estate and resided in Butte City, California, when the petition was filed in this case.

Decedent was born in India in 1910. In 1947, the area of India in which decedent lived became part of the newly formed

---

[1](...continued)
$4,575.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Pakistan. At that time, decedent became a citizen of Pakistan and was a citizen of Pakistan at the time of his death.

In 1912, decedent's father, Namat Khan (Namat), left India and immigrated to the United States. Decedent and his mother, however, remained in India. Decedent farmed a 15-acre parcel of land in India. In 1935, decedent married Hussain Bibi Khan in India. They had four children, including two sons, Aslam and Ashiq Ali Khan (Ashiq), and two daughters, Ahmed Bibi and Sarwaree Bibi. All four children were born in India or Pakistan.

During his lifetime, decedent spoke only Punjabi. He did not speak English and could not read or write any language.

When decedent's father, Namat, immigrated to the United States in 1912, he joined his brother Babu Khan (Babu) in Butte City, California. Babu had immigrated to the United States in 1901. Soon after Namat immigrated to the United States, two more of his brothers, Adalat Khan (Adalat) and Munshi Khan (Munshi), also came to the United States. Namat and his three brothers established a farming and real estate business in Glenn County, California.

In 1935, Namat formed another farming partnership (Fazal-Namat Ranch partnership) near Butte City, California, with Fazal Mohamed (Fazal). Fazal was unrelated to Namat and had immigrated from India to the United States in 1924.

Two of Namat's brothers, Adalat and Munshi, died before 1953. They were not survived by any descendants, and following their deaths, Namat and Babu controlled the family business.

Namat died in November of 1958 while visiting his wife and family in Pakistan. Namat's estate primarily consisted of his 50-percent interest in the Fazal-Namat Ranch partnership, plus interests in residential rental apartments and commercial properties located in Chico and Cridley, California. Namat left three-fourths of his estate to decedent and one-eighth to each of decedent's cousins, Chrag Mohamed Khan (Chrag) and Mohammed Ali Khan (Mohammed Ali). Although the Fazal-Namat Ranch partnership technically terminated upon Namat's death, Fazal, as the surviving partner, continued to manage the business of the ranch with court approval for a period of 5 years.

In 1958, shortly after Namat's death, decedent's son Aslam came to the United States. Aslam attended high school and college. He joined Babu in running the family business and worked part time for the Fazal-Namat Ranch.

In 1963, Aslam married Sarwaree Begum, who also had immigrated to the United States from India. Aslam and Sarwaree have three daughters.

In July of 1965, Babu died leaving no descendants. During Babu's lifetime, he had given interests in properties in California to decedent's sons, Aslam and Ashiq. Those interests

included real property interests in Chico, California, and stock in Yuba Plaza, Inc., a corporation formed to develop a regional shopping center. At the time of his death, Babu's estate consisted of farmland and a rental dwelling in Imperial County and his remaining stock in Yuba Plaza, Inc. In his will, Babu left one-half of his estate to decedent's son Aslam and one-sixth each to Chrag, Mohammed Ali, and Hushmat Bebe, all of whom were citizens of Pakistan. Aslam was the executor of Babu's estate. Aslam was the only family member in the United States and continued to operate the family business in partnership with an unrelated individual.

In 1969, Aslam received a bachelor's degree in agriculture from Chico State University and became a full-time trainee under Fazal. The relationship between Aslam and Fazal eventually deteriorated. Aslam stopped working with Fazal and enrolled at Chico State University to study for a master's degree in agriculture.

In April of 1971, decedent came to the United States for the first time on a temporary visitor visa. At that time, decedent was 61 years of age. Decedent's wife, son Ashiq, and two daughters remained in Pakistan. Decedent lived with his son Aslam and Aslam's family while in the United States. Late in 1971, Aslam developed severe health problems, and he lost most of his eyesight. Although decedent's temporary visa allowed him to

stay in the United States for only 6 months, decedent obtained extensions that permitted him to stay in the United States until March of 1974.

Fazal died on April 28, 1972, while decedent was in the United States. Fazal left his interest in the Fazal-Namat Ranch partnership to his wife and five nephews. Decedent sought and was granted an extension of his visa into 1974 in order to resolve problems with the dissolution of the Fazal-Namat Ranch partnership. The dissolution of the partnership required partitioning of the partnership property. The partnership farmed approximately 2,000 acres of irrigated rice land, some of which were leased. The property included valuable leases, land, machinery, equipment, a storage/dryer complex, and the headquarters. The division of the land required creating easements for roads, drainage, irrigation, and airstrips. Land used for growing rice must be leveled periodically at a cost of approximately $200 per acre. As a result, the acreage that had been most recently leveled was more desirable than the rest.

In July of 1973, Aslam obtained a permanent resident visa. Decedent requested an extension of his visa beyond April of 1974. His request was denied, and he returned to Pakistan on February 4, 1974.[3]

---

[3] On Sept. 14, 1974, decedent's son Ashiq visited the United States on a temporary visa. In October of 1974, Ashiq applied to have his status changed to that of a nonimmigrant

(continued...)

After decedent returned to Pakistan, he attempted to obtain a permanent resident visa. Robert Kutz (Kutz), who has been the Khan family's attorney since 1954, wrote a letter dated September 26, 1975, to the U.S. Consul General in Lahore, Pakistan, "with respect to the anticipated applications for permanent residency visa to the United States of * * * [decedent] and his wife Hussain Bibi." The stated purpose of the letter was to advise the Consul General that decedent owned a substantial amount of property in California and was capable of financially supporting himself and his wife in the United States. The Immigration and Naturalization Service, however, informed decedent that he would not be granted a permanent resident visa until his son Aslam became a U.S. citizen.

On November 15, 1976, the Fazal-Namat Ranch partnership was formally dissolved. Although the partnership was formally dissolved, not all of the property division was made at that time.[4]

On November 15, 1976, decedent, Aslam, Ashiq, and decedent's cousins, Chrag and Mohammed Ali, formed a partnership called

---

[3](...continued)
student. It does not appear from the record that the change in status was granted.

[4] One of Fazal's nephews died shortly before the agreement on the division of the partnership property had been reached, leaving a widow and seven minor children. As a result of the nephew's death, the division of partnership property had to be approved by the guardianship court.

Namat & Aslam Khan Farms. They placed the assets distributed to them from the Fazal-Namat Ranch partnership in the new partnership in order to keep the farm operating. Although they formed the new partnership, they immediately began discussing partitioning the land and machinery because Chrag and Mohammed Ali wanted their own separate farms. At the time, decedent, Ashiq, Chrag, and Mohammed Ali were in Pakistan. Aslam managed the partnership's 1,300-acre rice farming operation because he was the only partner then residing in the United States.

Fred Lucchesi (Lucchesi) is a public accountant. Lucchesi prepared the tax returns for the Fazal-Namat Ranch partnership, the Namat-Aslam Ranch partnership, and the partners of those partnerships until 1982 when he sold his practice to Harrison-Dailey Accountancy Corp. (Harrison-Dailey). Because of Aslam's poor health, Aslam requested that Lucchesi continue to do the bookkeeping and compile all tax information to be provided to Harrison-Daily.

John Woodmansee (Woodmansee) is a certified public accountant associated with Harrison-Daily who began preparing tax returns for the Khan family in 1982. Although Woodmansee prepared decedent's tax returns, Woodmansee never met decedent and met with Aslam only on four or five occasions. Lucchesi provided Woodmansee with the information necessary to prepare decedent's tax returns. Woodmansee did not review the returns

with decedent or any other member of the Khan family. After the returns were completed, Lucchesi would pick up the returns and take them to Aslam. Aslam was not able to read the returns because of his poor eyesight. Lucchesi did not review the returns in detail with decedent or Aslam. Lucchesi merely told Aslam where to sign the returns and whether there was any tax owed or a refund due. Aslam signed decedent's returns pursuant to a power of attorney.[5] Lucchesi then placed the signed returns in envelopes and mailed them. For taxable years before and including 1984, Aslam filed Forms 1040NR, U.S. Nonresident Alien Income Tax Returns, for decedent.

In June of 1982, Aslam became a naturalized U.S. citizen. After obtaining his U.S. citizenship, Aslam planned to have his entire family come to the United States.

In March of 1984, Aslam went to Pakistan and met with decedent and the other Pakistani partners in an attempt to resolve differences among the partners. In July of 1984, the U.S. Department of Agriculture began requiring recipients of rice program subsidies to have Social Security numbers. Although Aslam had a Social Security number, decedent, Mohammed Ali, and Chrag had only temporary tax identification numbers.

---

[5] On Apr. 6, 1981, decedent executed a general power of attorney, naming Aslam as his attorney-in-fact.

In 1984, decedent and Ashiq applied for immigrant visas. Ashiq's priority date was June 11, 1984. By letter dated September 4, 1984, the American Vice Consul in Lahore, Pakistan, informed Ashiq:

> Although this office had received satisfactory evidence establishing your entitlement to immigrant classification, a waiting period of an indeterminate length of time must be anticipated before further consideration can be given to your application. This is necessary because there are more applicants for visas than there are immigrant visa numbers available under the numerical limitations prescribed by law. At the present time, visa numbers in your category are * * * available only for persons who have a priority date earlier than Nov. 1979.

On October 1, 1984, decedent applied for and was issued an immigrant visa and alien registration based on his status as the parent of a U.S. citizen. On the application, decedent indicated that his wife and children would not be accompanying or following him, but that he intended to stay in the United States permanently. On January 20, 1985, decedent entered the United States on a permanent resident visa. Decedent was issued an alien registration receipt card ("green card") that identified him as a resident alien entitled to reside permanently and work in the United States. Decedent's wife, his two daughters, and his son Ashiq remained in Pakistan.[6]

---

[6] Ashiq was finally granted permanent immigration visas for his family in 1996, after waiting 12 years.

While in the United States, decedent resided with Aslam and his family. Aslam lived in a house owned by the family partnership. He added a bedroom and bath to the house for decedent's use. Decedent obtained a Social Security number. Decedent did not obtain a library card or join any social organizations, such as the American Association of Retired Persons. He was often visited by friends and associates who had come to the United States from Pakistan.

For purposes of filing decedent's 1985 tax return, Lucchesi advised Woodmansee that decedent had come to the United States during 1985 to live. Woodmansee prepared a Form 1040 marked "dual status" for decedent for the taxable year 1985, because decedent resided in Pakistan for part of the year and in the United States for the remainder of the year. Aslam filed the Form 1040 for decedent for the 1985 taxable year.

Decedent and Aslam frequently met with Kutz to discuss the division of the remaining assets of the Fazal-Namat Ranch. Although decedent understood a little English, he did not read, write, or speak English. Aslam served as a translator for decedent.

In 1986, decedent thought he had reached an oral agreement with Chrag and Mohammed Ali for the division of the partnership property. During that year, Aslam became ill and was hospitalized for about a month. Aslam was not able to travel to

Pakistan because of his poor health.  On December 24, 1986, decedent traveled to Pakistan to visit his family and to formalize the agreement with Chrag and Mohammed Ali for the division of the partnership property.

Before leaving for Pakistan, decedent applied for a permit to reenter the United States.  A reentry permit shows that the person to whom the permit is issued is returning to the United States from a temporary visit abroad and relieves the person from the necessity of securing a visa from an American Consul before returning to the United States.  On January 7, 1987, the Sacramento office of the Immigration and Naturalization Service issued decedent a permit to reenter the United States without a visa (reentry permit); the reentry permit was valid for multiple entries and had an expiration date of January 6, 1989.  The following "Important Information" concerning the effect of claiming nonresident alien status for Federal income tax purposes is provided on the last page (page 16) of the reentry permit:

> An alien who has actually established residence in the United States after having been admitted as an immigrant or after having adjusted status to that of an immigrant, and who is considering the filing of a nonresident alien tax return or the non-filing of a tax return on the ground that he is a nonresident alien, should consider carefully the consequences under the immigration and naturalization laws if he does so.
>
> If an alien takes such action, he may be regarded as having abandoned his residence in the United States and as having lost his immigrant status under the immigration and naturalization laws.  As a consequence he may be ineligible for a visa or other document for

which lawful permanent resident aliens are eligible; he may be inadmissible to the United States if he seeks admission as a returning resident; and he may become ineligible for naturalization on the basis of his original entry or adjustment as an immigrant.

The reentry permit was mailed to decedent's California address. Aslam read the reentry permit to determine the expiration date and then mailed the permit to decedent in Pakistan. Aslam did not read the "Important Information" on the last page of the permit.

Aslam's wife Sarwaree and his eldest daughter Robeena accompanied decedent on his trip to Pakistan. Sarwaree and Robeena purchased round-trip tickets and, after a 5-week visit, returned to the United States. Decedent did not purchase a round-trip ticket because he did not know how long it would take to finalize the partnership agreement.

Decedent's wife lived with Ashiq and his family in Pakistan.[7] When decedent returned to Pakistan, he stayed with Ashiq.

When preparing decedent's return for 1986, Lucchesi informed Woodmansee that decedent had left the United States permanently on December 24, 1986. On the basis of that information, Woodmansee prepared a Form 1040NR for decedent for the 1986

---

[7] Ashiq owned two houses, one located in the city and one in the village. The house in the village was previously owned by decedent on decedent's 15-acre farm. The record does not indicate exactly when decedent transferred ownership of the house to his son, but it is clear that Ashiq owned the house when decedent returned to Pakistan in 1986.

taxable year. On the return, Woodmansee indicated that decedent had left the United States permanently on December 24, 1986. Decedent's 1986 Form 1040NR was filed with the Internal Revenue Service at the Philadelphia Service Center on October 20, 1987.

In Pakistan, decedent found it difficult to work out the agreement with Chrag. During 1987, decedent again thought he had reached an agreement. Kutz drafted an agreement and sent it to Pakistan. Again Chrag refused to sign the agreement.[8]

While decedent was in Pakistan, his health began to fail. He was hospitalized in Pakistan from October 28 through November 10, 1988. Decedent's reentry permit expired January 6, 1989. Following his hospitalization, he was very weak and his health continued to deteriorate. He was hospitalized again from February 9 through February 15, 1989, and December 11 through December 20, 1990.

Aslam visited his father in Pakistan in 1990. At that time decedent was not able to walk and often needed assistance with bathing and eating. Decedent wanted to return to the United States at that time, but his health would not permit him to make the long trip.

---

[8] A final written agreement was not reached until March of 1993.

Woodmansee prepared decedent's income tax returns on Forms 1040NR for taxable years 1987 through 1990. Lucchesi took the returns to Aslam and mailed them after Aslam signed the returns.[9]

Decedent died in Pakistan on February 25, 1991. In his will, decedent bequeathed $7,000 to his wife and $15,000 to each of his daughters. He bequeathed $2,000 in trust for the benefit of the poor of Pakistan. Decedent left the remainder of his estate (valued at $646,190 on the estate tax return) to be divided equally between his sons, Aslam and Ashiq.

Kutz assisted Aslam with the probate of decedent's estate. In order to prepare an inventory and evaluation of the assets, Kutz requested a copy of decedent's last income tax return. Kutz noticed that a nonresident return had been filed. Since he understood that decedent was a resident, he thought the wrong return had been filed. He called Woodmansee to question the filing of the nonresident return. Kutz followed up the phone call with a letter to Woodmansee after researching the income tax rules pertaining to the filing of returns by resident aliens.

On or about March 25, 1992, an amended Form 1040X for each of the taxable years 1986 through 1990 was filed with the Internal Revenue Service at the Philadelphia Service Center, on

---

[9] Decedent's Forms 1040NR for taxable years 1987 through 1990 were filed with the Internal Revenue Service at the Philadelphia Service Center.

the basis of decedent's status as a resident alien during those years.

On the Form 706, United States Estate Tax Return, petitioner indicated that decedent's domicile at the time of death was Butte City, California, and that decedent established the domicile in 1985. Most of decedent's business and property interests were located in the United States. At the time of decedent's death, those interests were valued at approximately $746,000. Decedent also maintained bank accounts in the United States.[10] At the time of his death the value of the deposits in his bank accounts was over $70,000. The only property decedent owned in Pakistan was the 15-acre farm, valued at $15,000 at the time of his death. In computing the Federal estate tax, petitioner claimed a unified credit of $192,800.

Respondent determined that decedent was not a resident of the United States on the date of his death and limited petitioner's unified credit to $13,000.

## OPINION

Section 2001 imposes a transfer tax on the taxable estate (determined under section 2053) of every decedent who is a citizen or resident of the United States. Section 2010 permits a credit of $192,800 against the estate tax imposed by section

---

[10] Decedent maintained a bank account in the United States as early as 1976.

2001. By contrast, section 2101 imposes a transfer tax on the taxable estate (determined under section 2106) of every decedent who is not a citizen and not a resident of the United States. Section 2102 generally permits a credit of $13,000 against the estate tax imposed by section 2101.

Decedent was a citizen of Pakistan at the time of his death. Therefore, since decedent was not a citizen of the United States, the proper computation of the estate tax liability depends upon whether decedent was a resident of the United States at the time of his death within the meaning of the estate tax provisions of the Internal Revenue Code.

For purposes of the estate tax, a resident is an individual who, at the time of his death, had his domicile in the United States. Sec. 20.0-1(b)(1), Estate Tax Regs. A nonresident is an individual who, at the time of his death, had his domicile outside the United States. Sec. 20.0-1(b)(2), Estate Tax Regs.

The term "residence" or "domicile" as contemplated by the Federal estate tax statutes has never been construed or defined by an all-inclusive or all-exclusive definition. "In fact, it seems that such a definition is impossible. Every case possesses peculiarities different from any other case, and the issue must be decided in the light of the facts peculiar to each case." Bank of New York & Trust Co. v. Commissioner, 21 B.T.A. 197, 203 (1930).

Under ordinary circumstances, the place of birth is one's first domicile. Id. There is no question about decedent's having been domiciled in Pakistan before his coming to the United States in 1971 on a temporary visitor visa.

We start with the fundamental principle that "a domicile once acquired is presumed to continue until it is shown to have been changed." Mitchell v. United States, 88 U.S. (21 Wall.) 350, 353 (1874); Estate of Nienhuys v. Commissioner, 17 T.C. 1149, 1159 (1952). If there is doubt, the presumption is that the domicile has not been changed. Weis v. Commissioner, 30 B.T.A. 478, 487 (1934). Section 20.0-1(b)(1), Estate Tax Regs., provides in part:

> A person acquires a domicile in a place by living there, for even a brief period of time, with no definite present intention of later removing therefrom. Residence without the requisite intention to remain indefinitely will not suffice to constitute domicile, nor will intention to change domicile effect such a change unless accompanied by actual removal.

Thus, for decedent to have established a new domicile in the United States, two things are indispensable: (1) Decedent must have lived in the United States, and (2) he must have intended to remain here indefinitely. Both elements must be present, and one without the other is insufficient to establish a new domicile. Mitchell v. United States, supra; Forni v. Commissioner, 22 T.C. 975 (1954); Estate of Nienhuys v. Commissioner, supra; sec. 20.0-1(b)(1), Estate Tax Regs.

Decedent lived in the United States from April of 1971 until February of 1974 and from January of 1985 until December of 1986. We must examine the facts to determine whether during either of those periods, decedent intended to remain indefinitely. As the Supreme Court stated in Williamson v. Osenton, 232 U.S. 619, 624 (1914): "The essential fact that raises a change of abode to a change of domicil is the absence of any intention to live elsewhere, * * * or, 'the absence of any present intention of not residing permanently or indefinitely in' the new abode." (Citations omitted.)

After careful consideration of the entire record, we conclude that when decedent came to the United States in 1985, he intended to reside here permanently.

Decedent first came to the United States in 1971 on a temporary visitor visa, and he obtained extensions that allowed him to stay in the United States for almost 3 years. He began seeking a permanent resident visa at least as early as 1975 but was informed that he would not be granted a permanent visa until his son Aslam became a naturalized citizen of the United States. In 1984, after Aslam obtained his citizenship, decedent applied for and obtained a permanent resident visa. He entered the United States on that permanent visa on January 20, 1985, and immediately obtained a green card and a Social Security number.

Most of decedent's business and property interests were located in the United States. As early as 1976, decedent

maintained a bank account in the United States.  He owned substantial farming and business interests located in California that he had inherited from his father in 1958.  Decedent gave his house in Pakistan to his son Ashiq, and the only property decedent owned in Pakistan was the 15-acre farm.

Decedent's family had a long history of immigrating to the United States.  When decedent was a young child, his father and three uncles immigrated to the United States and established extensive farming and real estate operations.  Decedent's eldest son, Aslam, came to the United States in 1958, was granted a permanent resident visa in 1973, and acquired his U.S. citizenship in 1982.

Decedent's second son, Ashiq, also wanted to immigrate to the United States.  He applied for a permanent resident visa in 1984, after Aslam obtained his citizenship, but was not able to obtain an immigrant visa at that time because of the limitation on the number of immigration visas available as prescribed by law.  He finally was granted permanent immigration visas for his family in 1996, after waiting 12 years.

We do not think that decedent's failure to obtain a library card or driver's license after immigrating to the United States indicates that he did not intend to permanently reside in this country, considering he could not read or write English (or any other language).  Nor would we expect an individual who did not

speak English to join social organizations such as the American Association of Retired Persons.

Additionally, we do not think the fact that decedent's wife remained in Pakistan shows that decedent did not intend to reside permanently in the United States.  From the time decedent was 2 years old until his parents' deaths, his mother resided in Pakistan while his father resided in the United States.

On the basis of the record, we conclude that decedent lived in the United States in 1985 and at that time decedent intended to remain in the United States permanently.  Therefore, decedent became domiciled in the United States in 1985.

The fundamental principle that a domicile once acquired is presumed to continue until it is shown to have been changed now applies to decedent's domicile in the United States.  To establish that decedent reestablished domicile in Pakistan, it must be shown that he lived in Pakistan and intended to remain there indefinitely.  Both elements must be present, and one without the other is insufficient to establish a new domicile.

Decedent lived in Pakistan from December 24, 1986, until the time of his death.  Living in Pakistan without the requisite intent to remain there indefinitely, however, will not suffice to constitute domicile.  Sec. 20.0-1(b)(1), Estate Tax Regs.  A person acquires a domicile in a place by living there "with no definite present intention of later removing therefrom."  Sec. 20.0-1(b)(1), Estate Tax Regs. (emphasis added).

Respondent contends that the filing of Forms 1040NR for the taxable years after 1985 on decedent's behalf indicates that decedent intended to abandon his domicile in the United States. We disagree.

Decedent's tax returns were prepared by Woodmansee on the basis of information provided by Lucchesi. When Lucchesi took the returns to Aslam to be signed, he did not read or explain the returns to Aslam. Because of Aslam's poor eyesight, he did not read the returns himself. Aslam signed the returns under a power of attorney, and decedent never saw the returns. We do not think that the filing of the Forms 1040NR on decedent's behalf under these circumstances establishes that decedent intended to abandon his domicile in the United States.

Furthermore, the term "resident" has different meanings in different settings under differing statutes. Forni v. Commissioner, 22 T.C. at 986. An individual's classification as a resident of the United States for purposes of the Federal estate tax is dependent upon his being domiciled in the United States, whereas an individual's classification as a resident for purposes of the Federal income tax is determined by the standards set forth in section 7701(b).[11] Since an individual can have but

---

[11] Section 7701(b)(1)(A) provides that, for purposes of the Federal income tax, an alien individual is a resident of the United States (1) if he is a lawful permanent resident of the United States at any time during the calendar year or (2) if he meets the "substantial presence test". An individual is a lawful
(continued...)

one domicile, an individual may be a resident of only one country for purposes of the Federal estate tax. An individual, however, may be a resident of more than one country for purposes of the Federal income tax under section 7701(b). <u>Marsh v. Commissioner</u>, 68 T.C. 68, 72 (1977), affd. without published opinion 588 F.2d 1350 (4th Cir. 1978). Since the legal standard for determining residency for estate tax purposes differs substantially from that for determining residency for income tax purposes, we do not think the filing of the Forms 1040NR establishes that decedent did not intend to return to the United States.

Decedent returned to Pakistan in 1986 to visit with his family and to meet with his Pakistani cousins to formalize the agreement to divide the partnership property. Before leaving the United States, decedent applied for a reentry permit. Decedent's actions indicate that when he left the United States, he intended to return as soon as the agreement was finalized. We think he did not purchase a round-trip ticket because he did not know exactly how long it would take to formalize the agreement with

---

[11](...continued)
permanent resident of the United States at any time if (A) that individual has the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, and (B) that status has not been revoked (and has not been administratively or judicially determined to have been abandoned). Sec. 7701(b)(6). An individual meets the substantial presence test with respect to any year in which he is present in the United States at least 31 days during the taxable year and a sum of 183 days, calculated pursuant to a weighted formula, during the taxable year and 2 preceding years. Sec. 7701(b)(3)(A).

Chrag and Mohammed Ali.  Decedent had a definite intention of leaving Pakistan and returning to the United States.  A change of abode with present intent to return to the former abode upon the contemplated happening of an event in the indefinite future, such as completion of business, recovery of health, termination of employment, or recall by employer, is not a change of residence or domicile.  Crespi v. Commissioner, 44 B.T.A. 670, 676 (1941).  Therefore, decedent did not acquire a new domicile in Pakistan when he left the United States in December of 1986.

We also do not think that the expiration of the reentry permit indicates that decedent changed his mind and abandoned his intention to return to the United States.  The reentry permit expired after decedent's health began to fail and following his first hospitalization in Pakistan.  The expiration of the reentry permit meant that decedent would have had to apply for a returning resident visa from the American Consul before returning to the United States.  It was not unreasonable for decedent or a family member to wait until decedent's health improved and he was able to travel before applying for a returning resident visa.

A domicile is not changed even by long continued absence if there is any intention of returning, "even though intention be doubtful".  Weis v. Commissioner, 30 B.T.A. at 487 (emphasis added).  Decedent had a definite intention of leaving Pakistan and returning to the United States.  Most of decedent's business and property interests were located in the United States.  At the

time of decedent's death, those interests were valued at approximately $746,000.  Decedent also maintained bank accounts in the United States.  At the time of his death the value of the deposits in his bank accounts was over $70,000.  By contrast, the only property decedent owned in Pakistan was the 15-acre farm, valued at $15,000 at the time of his death.  The record shows that decedent wanted to return to the United States, but his poor health prevented him from doing so.

No one, except the individual, knows or can know with absolute certainty whether, in fact, he chooses to abandon his domicile and adopt a new one.  "We can only have a belief of varying degrees of certainty, after considering that person's declarations, conduct, character, temperament, etc."  <u>Bank of New York & Trust Co. v. Commissioner</u>, 21 B.T.A. at 203.  On the basis of the record as a whole, we conclude that decedent never abandoned his domicile in the United States.  We hold, therefore, that decedent was a resident of the United States on the date of his death.

To reflect the foregoing and because of concessions by petitioner,

<u>Decision will be entered</u>

<u>under Rule 155</u>.