**FROMM LABORATORIES, INC.,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

No. 13291.

United States Court of Appeals
Seventh Circuit.

Nov. 1, 1961.

Rehearing Denied Dec. 1, 1961.

Richard P. Tinkham, Wausau, Wis., William F. Kolbe, Peoria, Ill., Charles F. Smith, of Smith, Puchner, Tinkham & Smith, Wausau, Wis., Leo C. Duersten, Racine, Wis., of counsel, for petitioner.

John B. Jones, Jr., Acting Asst. Atty. Gen., Tax Division, Sharon L. King, Atty., U. S. Dept. of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and KNOCH, Circuit Judges.

HASTINGS, Chief Judge.

Fromm Laboratories, Inc., the taxpayer, has petitioned us to review a decision of the Tax Court of the United States.[1] This decision sustained the Commissioner's determination of certain deficiencies in federal income tax for the taxable years ending May 31, 1951 through May 31, 1954.

1. Tax Court Docket Nos. 57348, 60572 and 60594.

The deficiencies arose from the Commissioner's disallowance of (1) deductions taken by petitioner in each of the years involved as amortization of research and development cost of certain patents and (2) the inclusion by petitioner of this cost for research and development in its equity invested capital as paid-in surplus for the purpose of computing its excess profits tax for the years 1951, 1952 and 1954. The Tax Court sustained the Commissioner's disallowance. Fromm Laboratories, Inc., P–H 1960 T.C. Mem.Dec. 60,202 (1960).

The question presented for review is whether the Tax Court erred in sustaining the Commissioner's disallowance of these two items.

There is no dispute as to the relevant facts found by the Tax Court and stated in its opinion. They may be generally summarized in the following narrative.

The four Fromm brothers were pioneers in raising fur-bearing animals for the purpose of selling their pelts. Before 1929, the fur producing activities were carried on in part through a joint venture operated entirely by the brothers and in part through a joint venture operated by them and Edwin J. Nieman.

Fromm Bros., Inc., whose capital stock was owned by the brothers in equal proportions, and Fromm Bros., Nieman & Co., whose stock was owned one-half by Fromm Bros., Inc. and the four brothers and one-half by Edwin J. Nieman and his wife, were formed in 1929 to carry on the fur producing business in place of the joint ventures. At all times since July, 1933, Fromm Bros., Inc. has held a controlling interest in Federal Silver Fox Farms, Inc. and Fromm Bros. Silvercross Fox Farm, Inc. These corporations were formed to engage in the business of raising fur-bearing animals. Edward Fromm has at all times been president of all four corporations.

Many of the principal activities of the four Fromm fur corporations were conducted cooperatively. These included farming out the young foxes to the furring ranges, trapping, killing and pelting the foxes, and marketing the pelts. The expenses involved were borne initially by Fromm Bros., Inc. but were allocated periodically among all four corporations on the basis of the number of foxes which each placed on the ranges. The amount so allocated to each particular corporation was deducted by each, in turn, on its income tax return as a current operating expense. The proceeds, likewise, were received by Fromm Bros., Inc. and later allocated to each particular corporation.

In the winter of 1921, the Fromm brothers began to experience deaths in their fox herds. They attributed these losses to disease but could find no medical preparation which would meet their problem. In 1924, Robert Gladding Green, M.D., a member of the faculty of the University of Minnesota, went to the Fromms and expressed a desire to do research on their disease problem. The Fromms agreed and Green began his work. In a short time, Green determined that one of the diseases affecting the foxes was fox encephalitis, and he developed a serum to combat this disease. Large amounts of this serum were used from 1930 to 1939 to inoculate most of the silver fox pups of the four Fromm corporations without any separate charge being made therefor. During this early period, Green also developed a fox distemper serum which was likewise used to inoculate the fox herds, without any separate charge.

Until 1929, when Fromm Bros., Inc., and Fromm Bros., Nieman & Co., were organized, the four Fromm brothers paid all the expenses and furnished all of the animals incident to Green's work. Thereafter, from 1929 through 1944, substantially all of Green's expenses at the University of Minnesota and also certain amounts paid to him and his associates as salary were paid initially either by Fromm Bros., Inc. or by Fromm Bros., Nieman & Co.; these expenses were then, at least from 1933 through 1944, the pertinent period, allocated among all four Fromm corporations on the basis of the number of breeder animals which each owned. The amounts so allocated were

then taken by these corporations into their books of account as current operating expenses and were deducted by them as operating expenses on their corporate federal income tax returns.

In about 1933, Green anticipated that his work might result in patents having commercial value. He suggested the formation of a corporation in which he would have an interest and to which title to any possible patents would be assigned. Edward Fromm agreed, and petitioner, taxpayer-corporation, was organized on July 29, 1933. At the time of incorporation, Green was issued 245 shares of stock out of a total issue of 500, and Fromm Bros., Inc., Edward Fromm and Walter Fromm were issued the remaining 255 shares. In 1939, after Green had obtained one patent for a distemper vaccine process and had filed application for two other related patents, the stock was redistributed so that one-half was owned by Green and his attorney and one-half by the four Fromm corporations, Edward Fromm and Walter Fromm. As with the four Fromm corporations, Edward Fromm was president of petitioner at all material times.

The organization of petitioner did not alter the procedure of allocating expenses to each of the four Fromm corporations and the subsequent deduction of these expenses by each of them.

In 1935, Fromm Bros., Nieman & Co. purchased the Lakefield Ranch. From that time, petitioner conducted its activities there. In 1945, petitioner purchased the ranch, financing the purchase by delivery of a purchase money mortgage.

The activities of petitioner at Lakefield continued as before. Research for the development of vaccines was increased due to dissatisfaction with the earlier serums. The serums and vaccines used were produced at Lakefield. Petitioner performed diagnostic services for the Fromm corporations, and beginning in 1938 or 1939, these services were performed for veterinarians and outside fur ranchers.

In 1938, the patent for a fox distemper vaccine process was issued to Green and later assigned to petitioner. In 1942, two patents for mink distemper vaccine processes were issued to petitioner as assignee of Green. In 1945, a patent for a process of preserving the serums and vaccines was issued to petitioner as assignee of Heinz Siedentopf, an assistant employed by Green. The expenses involved in producing these patents were not capitalized, but rather were allocated among the four Fromm corporations as current operating expenses. The fox distemper vaccine was discovered to be effective for dogs, and in 1943 a license for unlimited sale for such use under the name of Distemperoid was issued in petitioner's name by the United States Department of Agriculture. From 1940 until 1945, all expense and income relating to the production and sale of Distemperoid were included in the Lakefield accounts of Fromm Bros., Nieman & Co. and not in the accounts of petitioner.

By 1939 or 1940, Green had developed a fox encephalitis vaccine. The process was never patented. This vaccine was produced at Lakefield, and during the years 1938 through 1940, large quantities were used to inject animals belonging to the four Fromm corporations. As with the expenses attributable to the other vaccines and serums, these expenses were allocated to and deducted by the four Fromm corporations.

Shortly after Fromm Bros., Nieman & Co. purchased the Lakefield properties, it set up in its general ledger a new series of accounts known as Lakefield Accounts, mentioned earlier. Included were several asset accounts, various profit and loss expense accounts, and an income account. The income and expenses included in these Lakefield accounts and the Minnesota expenses which were paid initially by Fromm Bros., Inc., or by Fromm Bros., Nieman & Co. were not allocated to petitioner. Petitioner did not pay any of such expenses. Also, none of them were from year to year treated by any of the Fromm corporations or by petitioner itself as a contribution to the capital or paid-in surplus of petitioner; rather, as above noted, each of the Fromm

corporations treated the amounts allocated to it as part of its own operating expenses and deducted the same as current operating expenses on its income tax returns.

Petitioner did not include in its accounts or report on its income tax returns any of the income from the operation of Lakefield for any of the years 1935 through 1944. Nor did petitioner, from year to year, enter in its accounts or deduct on its returns any portion of the expenses which were included in the Lakefield Accounts for these years, or any of the Minnesota expenses which were paid initially by Fromm Bros., Inc., or by Fromm Bros., Nieman & Co.

When petitioner purchased the Lakefield properties in 1945, its operations were enlarged. Sales increased from $10,738.25 for the fiscal year ending May 31, 1945 to $207,108.52 for the fiscal year ending May 31, 1946, and over the same years cost of goods sold increased from $7,952.73 to $139,701.43 and operating expenses from $119.35 to $71,005.71.

As of May 31, 1946, petitioner included for the first time among the assets on its books, "Patents" at a cost of $10,587.91. These patents were those previously assigned to petitioner subject to an adjustment of accounts. The adjustment of accounts was effected at about the time the "patent" book entry was made by making a counter-credit to Green's drawing account in the same amount of $10,587.91.

In 1951, the entries in question on this appeal were made in petitioner's accounts. E. C. Koenig, petitioner's comptroller, set up on petitioner's books a new depreciable asset account which he designated as "Research and Development Costs" in the amount of $771,765.17. Secondly, as a counter adjustment, he set up a new capital account which he designated as "Paid-in Surplus," in the same amount. Each of these new accounts was based on a journal entry made as of May 31, 1951. No similar accounts had theretofore been included in petitioner's books at any time since its incorporation.

The procedure which Koenig followed in setting up the depreciable asset account and new capital account on petitioner's books in 1951 and in determining the amount of $771,765.17 entered in each of such accounts was as follows: (1) he took from the books of the four Fromm corporations expenses incurred at the University of Minnesota and at Lakefield during the years 1933 through 1944 which had been allocated among the fur corporations as operating expenses; (2) he treated the aggregate amounts of the expenses which he so selected for each year as having been contributed to petitioner by the four Fromm corporations in cash and as paid-in surplus from year to year corresponding to dates that such expenses were paid; (3) he treated all these amounts as having been expended by petitioner rather than by Fromm Bros., Inc., or Fromm Bros., Nieman & Co.; (4) he treated all of the amounts as capital expenditures rather than current operating expenses; (5) he included all of the amounts among petitioner's assets as the amortizable costs of the patents and processes; and (6) he attributed to the new asset a useful life of 17 years from November, 1938, which was the date on which the first patent was granted to Green. It was this and other patents which had separately and previously been capitalized in 1946 at a cost of $10,587.91.

The effect of these adjustments to petitioner's books was: (1) To enable taxpayer to claim increased deductions for amortization and depreciation for income tax purposes; (2) to enable petitioner to claim an enlarged credit for excess profits tax purposes; and (3) to enable petitioner to report either an operating loss or a reduced operating profit for each of the taxable years here involved.

The issue before us is the propriety of the 1951 adjustments made by Koenig on petitioner's books. This issue presents the following questions:

1. Whether the Tax Court correctly held that taxpayer failed to carry its burden of establishing a right to depreciation or amortization deductions of

claimed "Research and Development Costs."

2. Whether the Tax Court correctly held that taxpayer is not entitled to include the amount of the claimed "Research and Development Costs" in its equity invested capital as "Paid-in Surplus" for the purpose of computing its excess profits credit for the years 1951, 1952 and 1954.

The Internal Revenue Code of 1939, which is here controlling, makes provision in Section 23(1) thereof,[2] for the allowance of deductions for depreciation or amortization of assets by a taxpayer in its trade or business.

The Supreme Court, in considering this section of the 1939 Code, recently defined the theory underlying such an allowance as follows: "It was the design of the Congress to permit the taxpayer to recover, tax free, the total cost to him of such capital assets * * *." Massey Motors, Inc. v. United States, 1960, 364 U.S. 92, 96, 80 S.Ct. 1411, 1414, 4 L.Ed.2d 1592.

Similarly, it was earlier held that the cost of such property means "cost to the taxpayer," and that where a taxpayer has no capital investment in property and merely exercises the right of ownership thereof, this does not give rise to the right of a depreciation allowance in respect to the capital asset. Detroit Edison Co., 45 B.T.A. 358, 361, affirmed, Detroit Edison Co. v. Commissioner of Internal Revenue, 6 Cir., 1942, 131 F.2d 619, 622, affirmed 1943, 319 U.S. 98, 102, 63 S.Ct. 902, 87 L.Ed. 1286

In his opinion, Judge Pierce, speaking for the Tax Court, summarized his views on the factual situation surrounding this issue as follows:

"As regards the claimed *cash* costs of $771,765.17, we are convinced from our examination and weighing of all the material facts and circumstances, that the expenditures making up such 'costs' were not, in fact, paid or incurred by petitioner; and we are convinced also that none of the same was *contributed* to petitioner by any of its stockholders. To the contrary, the evidence establishes that all these expenditures were incurred and paid either by Fromm Bros. Inc., or by the Fromm-Nieman corporation, pursuant to a joint undertaking of all four Fromm fur corporations. The primary purpose of this joint undertaking was to combat and control disease in the animal herds of these corporations. The expenses of such joint undertaking were offset, joint-venture-wise, against the income of the undertaking; and the resulting net deficit was, also joint-venture-wise, allocated among the members of the undertaking, in accordance with their pre-arranged method—in the instant case, on the basis of the number of animals owned by each.

"The contemporaneous records of the Fromm fur corporations negative the existence of any intention on their part to contribute to petitioner any of the expenditures here involved. To the contrary, their records clearly reveal that they intended to, and did, retain the benefit of such expenditures for their own corporate purposes—by including same in their own books of account as current operating expenses, and by deducting the same on their income tax returns, in order to obtain for themselves substantial tax benefits.

\* \* \* \* \* \*

"We are impressed by the fact that the Fromm fur corporations classified all these expenditures, currently and consistently over a long period of years, as operating expens-

---

2. "Sec. 23 [as amended by Sec. 121(c), Revenue Act of 1942, c. 619, 56 Stat. 798]. Deductions from Gross Income.
"In computing net income there shall be allowed as deductions:
\* \* \* ● ●

"(l) *Depreciation.* A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
"(1) of property used in the trade or business * * *". 26 U.S.C.A. § 23.

es. The agents of the Internal Revenue Service, in their audits of the returns of these corporations, made no adjustments with respect to such classification. And also, a nationally known accounting firm which audited the records of said corporations for the year 1942, likewise made no adjustment. We regard the evidence herein to be insufficient to establish that the contemporaneous judgments and actions of all these parties were erroneous.

"Finally, we deem it significant that none of the alleged *cash* costs was entered by petitioner in its books of account until the close of its fiscal year 1951—which was long after the 1933–1944 period, when the expenditures are claimed by petitioner to have been contributed to it as 'paid-in surplus.' * * * "

From our review of the record and the foregoing statute and authorities cited, we hold that petitioner has failed to satisfy its burden of establishing its right to such deductions and that the Tax Court did not err in so holding.

As a consequence, petitioner must fail on the second contested issue of whether in computing its excess profits tax liabilities for the years 1951, 1952 and 1954, it is entitled to include in its equity invested capital the claimed "paid-in surplus" of $771,765.17.

Since this "paid-in surplus" is represented by the identical items which were claimed as cash "costs" of capital assets under the first issue hereinabove considered, what we have said there applies here also.

We hold that the Tax Court did not err in holding that no portion of said $771,765.17 was contributed to petitioner as paid-in surplus at any time.

We have considered all other subsidiary questions argued by both parties and deem it unnecessary to discuss them. Our holdings here are dispositive of this petition for review.

The decision of the Tax Court is Affirmed.