MARKO DUROVIC, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1633–65. Filed June 24, 1970.

*Douglas L. Barnes* and *R. Thomas Howell, Jr.*, for the petitioner.
*Sheldon Chertow*, for the respondent.

OPINION

In 1942, petitioner Marko and his brother, Stevan, emigrated from Europe to Argentina. Stevan was a doctor of medicine and a research scientist. His research had been in the field of cancer. Upon his arrival in South America Stevan contacted various persons in the Argentinian scientific community with a view toward resuming his research work. With financial backing from a relative of Marko's wife, Stevan was able to resume his search for a stimulant active against cancer.

While searching for this stimulant, Stevan, in 1944, unexpectedly discovered a substance (Kositerin) which showed activity against hypertension. During the next 12 years substantial sums were spent in the development and production of this substance. Most of these expenditures were initially defrayed or ultimately absorbed by Marko. The product was destroyed in 1956 due to spoilage. It was then owned by Marko.

In 1947, Stevan's research produced a second substance (Krebiozen) which showed activity against malignant tumors. With financing from Argentinian entrepreneur, Juan Tanoira, Stevan was able to produce enough of this substance for 200,000 ampules of the drug Krebiozen. In 1949, Stevan left Argentina for the United States. The Krebiozen raw material was later brought to the United States by Marko, who had purchased the raw material from Tanoira. Together the brothers, with the assistance of several U.S. scientists, undertook to make the drug available, on an experimental basis, to physicians caring for patients with advanced cancer.

Distribution of the drug was accomplished by a partnership made up of Stevan and Marko. Only after Marko and Stevan had depleted their financial resources did the partnership, in 1954, request payment for ampules of Krebiozen being distributed. The correctness of the cost of goods sold attributed to these ampules and shown on the partnership information returns for each of the years in issue is the central question in this case. However, before reaching this question, we must first consider several preliminary issues raised by the parties.

### Issue 1. Statute of Limitations

Section 6501(a) states the general rule that assessment of taxes shall be made within 3 years after the return in question was filed. Two exceptions to this rule are found in sections 6501(c)(1) and 6501(c)(3), which state, respectively, that assessment may be made at any time where a return has either been fraudulently filed or not filed at all.

In the instant case, petitioner, citing section 6501(a), contends that respondent's notice of deficiency (bearing a December 28, 1964, date) was not timely as to the years (1954 through 1958) now before this Court. Respondent disputes this contention, claiming in the alternative that, (a) for purposes of section 6501(c)(3), the partnership returns of information filed by Duga Illinois cannot be treated as petitioner's personal tax returns; and, (b) even if such treatment were proper, section 6501(c) would still permit assessment, it being respondent's alternate position that the partnership returns which were filed were false and fraudulent.

Since we agree with respondent's first argument, we need not consider the question of whether the returns filed on behalf of Duga Illinois were tainted with fraud.

Partnerships, under our system of taxation, are accorded a unique status. Rather than the partnership being held taxable for income generated by its activities, it is the individual partner who is liable for tax on his distributive share of partnership earnings. Sec. 701. Notwithstanding this peculiarity, section 6031 directs that every partnership file an annual return setting forth, *inter alia*, the items of its gross income and deductions and the names and distributive shares of its members. This provision, for purposes herein pertinent, must be contrasted with section 6012(a) which requires that every *individual* having a gross income of $600 [13] or more must file a return with respect to income tax. Given this statutory framework, the specific question we must now face is whether, in the absence of an individual tax return, the good-faith filing of a Form 1065 partnership return satisfies the requirements of sections 6012(a) and 6501(c)(3) where such partnership return is (1) complete on its face, and (2) discloses the only source of income of the individual partner in question. As stated above, we believe this question must be answered in the negative.

In support of his position, petitioner cites several cases which have considered the status to be accorded Form 1065 partnership returns within the context of section 6501(e)(1)(A)(ii).[14] See, e.g., *Jack Rose*, 24 T.C. 755 (1955); *Nadine I. Davenport*, 48 T.C. 921 (1967); *Genevieve B. Walker*, 46 T.C. 630 (1966); and *Elliott J. Roschuni*, 44 T.C. 80 (1965), which extended the reach of clause (ii) to Form 1120-S information returns.[15] In each of these cases the question con-

---

[13] For purposes of this discussion, and, as will be established at a later point in our opinion, Marko's gross income for each of the years in question is assumed to be in excess of $600.

[14] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(e) SUBSTANTIAL OMISSION OF ITEMS.—Except as otherwise provided in subsection (c)—

    (1) INCOME TAXES.—In the case of any tax imposed by subtitle A—

        (A) GENERAL RULE.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph—

       \*       \*       \*       \*       \*       \*       \*

        (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item.

[15] Where a corporation elects to conduct its business as a "tax-option" corporation, it is not liable for any of the regular corporate income taxes and does not have to file a Form 1120 corporate return. However, it is required under sec. 6037 of the Code to file an information return on Form 1120-S.

sidered was whether information omitted on the taxpayer's individual return, but disclosed on the partnership return, could be used to satisfy the ameliorating language of clause (ii) of section 6501(e)(1)(A); [16] and in each instance the Court agreed that the partnership return—

> should be taken into consideration in determining whether any omitted amount was disclosed in the [partnership] return in a manner adequate to apprise [respondent] of the nature and amount of such item. [*Genevieve B. Walker, supra* at 637–638.]

See also Rev. Rul. 55–415, 1955–1 C.B. 412.

Though we do not in any way reject the reasoning of the cases cited by petitioner, we do not feel they are apposite to the question at hand. The rationale underlying these cases was that respondent would not be at a disadvantage to detect errors, as envisioned by section 6501(e)(1)(A), see *Colony, Inc.* v. *Commissioner*, 357 U.S. 28, 36 (1958), where the taxpayer's individual return, as augmented by a Form 1065 return, was sufficient to furnish respondent with adequate "clues" as to the nature and amount of items omitted from the individual return but disclosed in the partnership return. *Benderoff* v. *United States*, 398 F.2d 132 (C.A. 8, 1968); and *Elliott J. Roschuni, supra.*

The cases in this area did not have to consider the question of whether, for purposes of sections 6012(a) and 6501(c)(3), a partnership return may be accorded the status of a partner's individual return. Even so, since the filing of a partnership return, without more, places respondent at an obvious disadvantage as to nonpartnership items of income (such as interest, dividends, and capital gain) which are shown only on the partner's individual return, we believe petitioner's argument must be rejected under the very same rationale employed by those cases which he looks to for support.[17]

For reasons similar to those expressed above, we also hold that petitioner's reliance on the "wrong return" cases of *Germantown Trust Co.* v. *Commissioner*, 309 U.S. 304 (1940), and *California Thoroughbred Breeders Association*, 47 T.C. 335 (1966), is also misplaced.

In *Germantown*, taxpayer trust company, on March 15, 1933, filed a Form 1041 fiduciary return for the year 1932, in which it accurately

---

[16] Pursuant to sec. 6501(e)(1)(A), the statute of limitations for assessment of tax is extended to 6 years if the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return. Under clause (ii) thereof, the computation of the "amount * * * omitted from gross income" excludes amounts disclosed in the return.

[17] See also sec. 301.6501(e)–1(c), Income Tax Regs., which provides that sec. 6501(e)(1) does not limit the application of sec. 6501(c).

set forth its gross income, deductions, net income, and the respective beneficiaries' shares. All of the beneficiaries included their shares in their individual returns. At a later time it was held that the trust should have been taxed as a corporation. Accordingly, the respondent prepared the appropriate corporation return and, after more than 2 years had expired, gave notice of a tax deficiency.

Under section 275(c) of the then Revenue Act of 1932, an exception to the normal 2-year statute of limitations arose if a corporation made no return of tax. Under this exception corporate tax could be assessed within 4 years after the date on which any shareholder filed his return. The issue in *Germantown* was whether the Form 1041 filed by the "trust" constituted a tax return for purposes of the statute of limitations.

Relying in part on the fact that the incorrect return filed by the "trust" contained all the data from which a tax could be computed and assessed, the Supreme Court held that the filing of the Form 1041 by a fiduciary in good faith commenced the running of the statute of limitations for assessment of corporate income tax, and that assessment was, therefore, barred. Compare *Commissioner* v. *Lane-Wells Co.*, 321 U.S. 219 (1944), where it was held that the filing in good faith of a Form 1120 corporate income tax return, in which the corporation denied it was a personal holding company, was not sufficient to start the running of the limitation period for personal holding company surtax (which should have been computed on Form 1120H).[18]

In the case of a partnership return filed without more, respondent is not benefited by all the data needed to compute the nonfiling partner's individual tax liability since, even if such partner did not, in fact, realize additional nonpartnership income, there is no way to ascertain this fact absent an individual return. Hence, we are not influenced by the result reached in *Germantown*. Nor is our conclusion altered in any way by the following language from our opinion in *West Coast Ice Co.*, 49 T.C. 345, 349–350 (1968):

In *Lane-Wells* the Supreme Court distinguished its decision in *Germantown Trust Co.* v. *Commissioner*, 309 U.S. 304 (1940), not, as petitioner claims, upon the ground that the return filed in *Germantown Trust* contained all the information required in the return which should have been filed, but because: "There [*Germantown Trust*] the only liability involved was for a Title I income tax, and the return was addressed to that liability, as to which the court held that it set the statute of limitations running. Here the taxpayer is under liabilities for two taxes and under an obligation to file two returns, * * *"

---

[18] See too *F. E. McGillick Co.*, 30 T.C. 1130, 1150 (1958); *John Danz*, 18 T.C. 454, 465 (1952); and *Automobile Club* v. *Commissioner*, 353 U.S. 180 (1957), where the filing of Form 990 information returns was not sufficient to activate the running of the statute.

We distinguish *Germantown Trust* from the facts of this case for exactly the same reason. \* \* \*

In the case of a Form 1065 partnership return, we need never reach the distinction employed by the Supreme Court in *Lane-Wells* since the indispensable prerequisite for the consideration underlying such distinction—the assumption that the filed return "showed all the facts necessary for respondent to compute taxes" (*Commissioner* v. *Lane-Wells Co., supra,* quoting from the circuit court opinion in that case)—is herein lacking. For absent from a partnership return are such items as the individual partner's itemized deductions, exemptions, payments, credits, and elections. Without such information there is no practical way in which individual tax liability can be ascertained or the computation thereof accomplished.[19]

Our opinion in *California Thoroughbred Breeders Association, supra,* in no way conflicts with this rationale. However, even if the *California* case could be read to support the position taken by petitioner, we believe that case is distinguishable since our holding there was based on the specific language of section 6501(g)(2).

## Issue 2. Rate of Exchange

In computing cost of goods sold, Duga Illinois converted Argentinian pesos into American dollars at the official exchange rate which prevailed at the time of the respective Argentinian transactions pertinent to this case. Respondent contests the use of the official exchange rate, and argues that the commercial exchange rate should have been applied. Should we adopt respondent's position, cost of goods sold will have to be adjusted downward, as evidenced by the following table which illustrates the disparity between the two rates of exchange for each of the years shown:

| Year | Official rate of exchange pesos to one dollar | Commercial rate of exchange pesos to one dollar |
|---|---|---|
| 1942 | 3.36 | 3.36 |
| 1943 | 3.36 | 3.36 |
| 1944 | 3.36 | 3.77 |
| 1945 | 3.36 | 4.01 |
| 1946 | 3.36 | 4.07 |
| 1947 | 3.36 | 4.06 |
| 1948 | 3.36 | 4.42 |
| 1949 | 3.36 | 5.47 |
| 1950 | 5.00 | 9.66 |

[19] We note, too, the following language from *Lane-Wells* which also contributed to the result reached therein:

"Congress has given discretion to the Commissioner to prescribe by regulation forms of returns and has made it the duty of the taxpayer to comply. \* \* \* The purpose is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished. \* \* \* [321 U.S. at 223 (1944.)]"

Though our research has failed to uncover any cases which are on all fours with the question before us, many cases have considered the issue of exchange rates in the context of blocked currency. See, e.g., *Morris Marks Landau*, 7 T.C. 12 (1946), (valuation of blocked pounds for gift tax purposes); *Estate of Anthony H. G. Fokker*, 10 T.C. 1225 (1948), (valuation of blocked Dutch guilders for estate tax purposes); and *Credit & Investment Corporation*, 47 B.T.A. 673 (1942), (valuation of loss resulting from investment in blocked German marks).

In almost all of these cases the Commissioner asserted deficiencies based upon the official rate of exchange. See *Ceska Cooper*, 15 T.C. 757 (1950); *Estate of Jan Willem Nienhuys*, 17 T.C. 1149 (1952); and *Credit & Investment Corporation*, *supra*. However, in each instance the courts were unwilling to accept this argument where it was patently clear that the official rate of exchange did not reflect the exchange rate at which a foreign currency could be traded for U.S. dollars. See *Ceska Cooper*, *supra*, wherein the Court stated:

It is our view that the value of the blocked British pound as determined in the free market of the United States should be used as the measure of petitioner's income in each of the taxable years from the salaries and profits which were credited to her account in England. [15 T.C. at 765.]

and *Credit & Investment Corporation*, *supra*, where the Court framed the issue before it as follows:

Having concluded that the marks used in the purchase of the securities in 1936 were blocked marks, the question remains whether they had a fair market value. * * * [47 B.T.A. at 681.]

Explicit in many of the blockage cases cited above is the fundamental consideration that United States taxation is "based on the value of property measured in terms of United States dollars." *Estate of Jan Willem Nienhuys*, *supra* at 1163. It is similarly evident from a reading of other foreign exchange cases that where gain or loss must be computed, it is the actual cost of the investment in terms of the number of dollars needed (*Willard Helburn, Inc.*, 20 T.C. 740 (1953)) which establishes basis, and the obtainable dollar equivalent of the currency received (*Edmond Weil, Inc. v. Commissioner*, 150 F. 2d 950 (C.A. 2, 1945), affirming a Memorandum Opinion of this Court) which determines return. See also *James A. Wheatley*, 8 B.T.A. 1246, 1249 (1927).[20]

The inescapable conclusion we draw from these cases is that taxation of international currency transactions is a pragmatic endeavor. In almost all instances the courts, either in converting the value of

---

[20] Compare *Eder v. Commissioner*, 138 F. 2d 27 (C.A. 2, 1943), where the court remanded the decision of the Board, with instructions to measure the return in terms of economic satisfaction. See also Rev. Rul. 64–307, 1964–2 C.B. 163, 166.

property into dollars or in determining the dollar equivalent of gain or loss, have attempted to employ a rule of reason which reflects *actual* dollar worth in terms of salient market conditions. After all, "Taxation is a practical matter,"[21] and should, therefore, attempt to capture the realities of the situation in question.

We believe that employment of the commercial rate of exchange permits this result since it is the commercial rate which actually determines the number of dollars which reasonable businessmen dealing at arm's length will be willing to pay for a commodity at a given time. The validity of this result becomes more apparent when submitted to facts of the case at bar; for, here, Duga Illinois and petitioner realized American dollars as a result of expenditures made in Argentina. To value these expenditures at any rate of exchange other than the one which most accurately reflects the number of dollars which would have been required for the same expenditures (i.e., the commercial rate) would, we believe, result in a distortion of income. Accordingly, we hold that the commercial rate of exchange should have been used in determining cost of goods sold.

*Issue 3. Presumptive Correctness of Respondent's Determination*

Petitioner next contends that the presumption of correctness which normally attaches to respondent's determination, *Welch* v. *Helvering*, 290 U.S. 111, 115 (1933), must be negated in this case because of the alleged arbitrary manner in which the respondent denied all of the amounts claimed as cost of goods sold on the information returns filed by Duga Illinois during the years 1954 through 1958. See *Helvering* v. *Taylor*, 293 U.S. 507 (1935). Petitioner's primary assertion is that respondent could not have arrived at a rational cost-of-goods-sold determination under circumstances where respondent's agents were prevented access to the books and records needed for such a determination. Cf. *Herbert Schellenbarg*, 31 T.C. 1269, 1277 (1959). The short answer to this argument is that where the taxpayer has refused to produce books and records requested by respondent's agents, the taxpayer (and not respondent) will be held accountable for any procedural or evidentiary consequences flowing from such a declination. See *Estate of Henry Wilson*, 2 T.C. 1059, 1086 (1943), where the Court used the following language in upholding an estate tax deficiency which was based upon a return constructed by respondent's agent:

Respondent in making a return is forced by the very nature of things to rely upon the information and testimony given by persons knowing the facts. If they fail

---

[21] *Edmond Weil, Inc.*, a Memorandum Opinion of this Court dated Aug. 9, 1944, in which the Court used the commercial rate of exchange where the "evidence [established] that petitioner was never paid the 'official' rate in exchange transactions."

or refuse to make a disclosure of pertinent facts respecting the estate, or if they deny the existence of assets includible in the gross estate, respondent can not be charged with arbitrary, capricious, and unreasonable action if after discovery of the existence of such assets, coupled with a continued refusal by the interested parties to make any further disclosure as to assets of the estate, he determines the value of the gross estate from such testimony and information as is available to him and includes therein all assets which may have been jointly held by decedent at death or transferred under circumstances which might bring the property within the estate. Much of what has occurred here is due to petitioners' own acts of omission and commission. If because thereof they find themselves in difficulty with the tax authorities, it is a difficulty of their own making and they should not be heard to complain.[22]

We start with two basic propositions: (1) all persons subject to tax or required to file an information return must maintain books and records sufficient to establish all matters shown on a tax return or return of information filed by such persons (sec. 1.6001–1, Income Tax Regs.);[23] and (2) these books and records are subject to examination by respondent or his agent whenever the liability of any person for any internal revenue tax is at issue. Sec. 7602.

In the case at bar, respondent's agents were thwarted in their efforts to review books and records relating to income which petitioner may have been liable for as a result of his partnership interest in Duga Illinois. Consequently, respondent's agents were forced to build their case on accountant's work papers and other secondary evidence made available to them. As a result, cost of goods sold was denied in toto, and respondent's notice of deficiency held petitioner responsible for his distributive share of the recomputed partnership income for each of the years in question. (See sec. 702.)

Though we recognize that Special Agent Mannie of the Intelligence Division was present at all stages of respondent's investigation we do

---

[22] See also *Herbert Schellenbarg,* 31 T.C. 1269, where, after unsuccessful and repeated requests for supporting records, respondent denied in toto unrecorded expenses which were alleged to have been incurred in conjunction with unrecorded sales to which petitioner admitted. In upholding the deficiency determination which flowed from respondent's denial, we stated that where petitioner is unable, through negligence, to produce books and records requested by respondent's agents and which should have been in his possession, respondent's action, in the absence of such production, will not be deemed arbitrary:

"The great weight of * * * [petitioners'] argument is directed at respondent's failure to offset * * * additional receipts by what * * * [petitioners] claim were unrecorded expenses * * * [related to] unrecorded sales made by them * * *. Yet, in the face of repeated requests by respondent's agents, no evidence was produced to substantiate these unrecorded transactions. * * * In this posture, we cannot say the respondent's determination was arbitrary and excessive as contended by the petitioners. Thus, its presumptive correctness has not been destroyed * * *.

"Though petitioners' inability to offer proof of these unrecorded transactions may work a seeming hardship upon them, it is unquestionably of their own making. [31 T.C. at 1277.]"

[23] In the case of a partnership, sec. 6031 provides that every partnership must file an annual return of information containing the information specified in that section. The return, when filed, must bear the signature of at least one partner. Sec. 1.6063–1(a), Income Tax Regs.

not feel that this fact alone is sufficient to transform petitioner's recalcitrance, notwithstanding that petitioner's attorney may have regarded certain of petitioner's constitutional privileges to be at stake, into a procedural windfall. Indeed, as has been stated in *Boren* v. *Tucker*, 239 F. 2d 767 (C.A. 9, 1956), in every investigation there exists the possibility that information made available to respondent or one of his agents might lead to criminal prosecution:

In truth, we presume the "Secretary or his delegate" would be unfaithful to his statutory responsibilities if in every examination, once an incorrect return has been demonstrated or established, he did not come to some preliminary conclusion as to whether there existed facts sufficient upon which to base a possible criminal prosecution, without coming to any conclusion as to whether there should be a criminal prosecution. [239 F. 2d at 772.]

Accordingly, it seems to us that petitioner's position would be no more compelling if the refusal to produce books and records had been made at a time when Special Agent Mannie had not yet been assigned to the case. See and compare *United States* v. *Caiello*, 420 F. 2d 471, 472 fn. 2 (C.A. 2, 1969). Were we faced with such a set of circumstances, we are confident that petitioner would be denied the procedural parlay which he now seeks. We do not believe that he stands on better footing with the facts of the case now before us.

Moreover, that the records sought may have been immune to process by virtue of the Federal indictment which anteceded the requests made to petitioner's attorney by respondent's agents (see *Internal Revenue Agent* v. *Sullivan*, 287 F. 138 (W.D. N.Y. 1923))[24] does not assist petitioner. The crucial fact is that such records were denied to respondent's agents.[25] Under such circumstances, we cannot say that respondent's determination, which ultimately was based upon the investigation of Accountant Grauer's workpapers, as well as the other sources of information, was so insubstantial as to render arbitrary the deficiency determination prepared therefrom.

---

[24] See also *United States* v. *O'Connor*, 118 F. Supp. 248 (D. Mass. 1953) ; cf. *Wild* v. *United States*, 362 F. 2d 206 (C.A. 9, 1966) ; and *Venn* v. *United States*, 400 F. 2d 207 (C.A. 5, 1968), where the production of withheld records was required under sec. 7604(a), notwithstanding the presence of a special agent during the examination and the possibility of subsequent criminal proceedings.

[25] We note that neither petitioner nor his attorney was approached by respondent's agents until after the jeopardy assessment which was levied on Oct. 28, 1964. However, Agent Schwartz did contact Marko's attorney prior to the notice of deficiency on Dec. 28, 1964. Moreover, in previously focusing their attention on Stevan, Agents Mannie and Schwartz were following the most logical course of action available to them since Stevan had led them to believe that he had possession of the Duga Illinois records and that they could be found at Promak Laboratories.

We also note that, although respondent's agents failed to notify petitioner or his brother that a second inspection of Duga Illinois books for the year 1957 would be required, such failure does not affect the result reached herein since the books sought were not made available to respondent. See *United States Holding Co.*, 44 T.C. 323, 327 (1965) ; and sec. 7605(b).

In arriving at the above result, we have carefully considered the purpose of the presumption of correctness which attaches to respondent's determination and the role which it plays at trial. We note initially that the—

presumption is not evidence in itself and may be rebutted by competent evidence. It operates merely to place upon the opposing party the burden of going forward * * * [*Compton* v. *United States*, 334 F. 2d 212, 216 (C.A. 4, 1964).]

As such it is merely a fixation of the procedural posture of the parties. Where as here both parties have come forward at trial with a plethora of evidentiary matter, we feel no compulsion to rearrange this procedural alignment. To receive from petitioner the very evidence previously denied to respondent, and to, at the same time, remove from petitioner the burden of going forward would, we think, be contrary to one of the basic considerations underlying the presumption— that the party who is most familiar with the facts in dispute should also be the party upon whom rests the burden of going forward with the evidence.

### Issue 4. Cost of Goods Sold

We come now to the question of whether respondent erred in disallowing cost of goods sold to Duga Illinois for each of the years in issue. More specifically, we must decide whether Duga Illinois was entitled to cost-of-goods-sold deductions during these years; and, if so, the amounts which should have been claimed. We view this issue as being primarily factual.

The record of this case exceeds 1,300 pages. In addition, both parties have benefited us with scores of exhibits and interrogatories. Notwithstanding this mass of evidentiary matter, the picture we have before us of the events which comprise this case is blurred and cracked with age. In some instances witnesses were called upon to reconstruct with clarity events which occurred more than a quarter of a century ago. The uncertain narrative occasioned by the dimmed memories of these individuals only served to compound with inconsistency a case which would have been difficult to try under the most favorable of circumstances. Nevertheless, we have attempted in our findings of fact to weigh all such inconsistencies, and to arrive at a fair and rational narration of the events which occurred herein. For the most part, therefore, the immediate discussion will merely reappraise these facts in the context of the question presented.

Whether or not a business venture conducted by two or more persons will be regarded as a partnership for tax purposes depends, in large measure, on the intent of the persons involved. *Claire Giannini Hoffman*, 2 T.C. 1160 (1943). The facts in this case indicate that Stevan and Marko were partners for each of the years in question.

This partnership, which was formed for the purpose of distributing and selling Krebiozen in the United States, came into being in 1950 shortly after Marko purchased the Krebiozen raw material from Tanoira. Marko's basis in the raw material, for partnership income tax purposes, is derived from the M$N3,005,000 price paid to Tanoira.[26] See sec. 722.

The amount paid to Tanoira, while based upon analogous costs (M$N3,005,000) incurred in the development of Kositerin (as adopted by MPH), also reflected actual cost experience (M$N2,997,500) as computed by Accountant Muchenik. As such, we believe the M$N3,005,-000 figure to be a fair indicator of the raw material cost of the 200,000 ampules of Krebiozen produced in the United States. To this extent, Duga Illinois was justified in taking the cost-of-goods-sold deductions claimed on the partnership returns. However, we believe this amount should have been spread over all of the ampules produced (200,000), as opposed to the number of ampules on hand in 1954 (136,097) when the partnership first solicited payment for the drug. Though we fully appreciate the altruistic, as well as practical, considerations which governed the choice of spreading costs over 136,097 ampules as opposed to 200,000 ampules, we are constrained to hold that, for the years 1954 through 1958, this method of apportionment did not clearly reflect income.

In addition to the amounts allowed above, the partnership also incurred extensive research expenses as well as extensive expenses related to sterilizing, ampuling, and packaging the drug. These amounts (totaling $105,387.38)[27] were recorded in an expense journal maintained by Olga and stipulated to by the parties,[28] and are properly allocable between (a) cost of goods sold and (b) research and

[26] Though we think it reasonable that Marko, at this time, may have intended to make a binding gift to Stevan of one-half of the raw material (which had, in fact, been produced during the term of Stevan's agreement with Tanoira), we cannot assume such an intention from the evidence now before us. Accordingly, for purposes of sec. 704(d), Marko will be treated as having contributed all of the 2 grams, 35 centigrams of raw material to the partnership.

[27] Total expenses actually recorded in the journal amounted to $130,713.48. However, of this amount, $20,953.44 was attributable to living costs and was treated by Olga as temporary living expenses while away from home (Argentina). Since petitioner's stay in this country was from the start "indefinite," see Leo M. Verner, 39 T.C. 749 (1963), as opposed to "temporary," see Beatrice H. Albert, 13 T.C. 129, 131 (1949), we view these expenses as being personal in nature. See and compare secs. 1.871–2(a) and (b), Income Tax Regs. Accordingly, the $130,713.78 shown on Olga's books has been reduced by $20,953.44. Additionally, since $4,372.66 is conceded to have been expended in furtherance of Institute, as opposed to partnership, activities, the $130,713.78 has been further reduced by this amount. Netted out, these adjustments yield a total expenditure figure of $105,387.38.

[28] See fn. 11, supra. Stipulation 5 states the following:
"Attached hereto and made a part hereof identified as Exhibit 6 is a copy of an original expense journal prepared by Mrs. Durovic reflecting expenses which were paid from October, 1949 until April, 1954 as identified therein."

experimental costs.[29] On our best judgment, we hold that, of these amounts, one-half ($52,693.69) was properly allocable to cost of goods sold. *Cohan v. Commissioner*, 39 F. 2d 540 (C.A. 2, 1930).

Summarizing our findings, we arrive at the following cost-of-goods-sold computation for each of the years in question:

Allocable costs:

(1) 3,005,000 M$N converted to U.S. dollars at (9.66 M$N to $1) commercial rate of exchange stipulated to be in force during 1950 _____ $311,076. 60

(2) U.S. expenditures_____ $52,693. 69

$363,770. 29

Number of ampules_____ 200,000. 00

Divided into total allocable costs =_____ $363,770. 29
Per ampule cost_____ $1. 82

| | Number of ampules distributed $\times$ $1.82 | = | Cost of goods sold |
|---|---|---|---|
| 1954 | 17,752 $\times$ $1.82 | | $32,308. 64 |
| 1955 | 30,674 $\times$ $1.82 | | 55,826. 68 |
| 1956 | 23,733 $\times$ $1.82 | | 43,194. 06 |
| 1957 | 33,722 $\times$ $1.82 | | 61,374. 04 |
| 1958 | 24,381 $\times$ $1.82 | | 44,373. 42 |

[29] See sec. 174 which, in part, permits a taxpayer to treat research and experimental costs, paid or incurred in a taxable year subsequent to Dec. 31, 1953, as noncapital expenditures. Since, as petitioner states on brief, "substantially all the costs in question were incurred prior to the effective date [of sec. 174] of the Internal Revenue Code of 1954," the tax treatment of such costs is governed by the case law pertinent to pre-1954 Code years. The rules developed by these cases are summarized in the following language from *John F. Koons*, 35 T.C. 1092, 1099 (1961):

"Prior to the enactment of the Code of 1954 there was no statutory provision dealing with the tax treatment to be accorded research and experimental expenditures, and the taxpayer had no option to treat such costs as deductible expenses. To the extent that they were ordinary and necessary business expenses they were deductible; to the extent that they were capital they could be capitalized and were recoverable through depreciation or amortization where the useful life was determinable. *Gilliam Manufacturing Co.*, 1 B.T.A. 967 (1925); *Hazeltine Corporation*, 32 B.T.A. 110 (1935), affirmed on this issue 89 F. 2d 513 (C.A. 3, 1937); *Claude Neon Lights, Inc.*, 35 B.T.A. 424 (1937); *Hart-Bartlett-Sturtevant Grain Co.*, 12 T.C. 760 (1949), aff'd. 182 F. 2d 153 (C.A. 8, 1950); *Red Star Yeast & Products Co.*, 25 T.C. 321, 341, 343 (1955). In the event, however, that they were not ordinary and necessary expenses and a period of useful life could not be definitely ascertained, the amortization of such expenditures was not allowable."

(See also Jack R. Miller, "Research and Development Costs," 7th Ann. N.Y.U. Tax Inst. 134 (1949).)

In the case at bar, we think it is clear that the expenditures for research and experimentation were calculated to perfect and improve Krebiozen so that it might be licensed for sale on a nonexperimental basis, and to establish its efficacy to the medical world. We think such expenditures were capital in nature; and, since the benefits to be obtained from such research were neither limited to the ampules already produced, nor susceptible to measurement in terms of useful life, we reluctantly see no way in which to allow amortization of such expenditures for the years in question. See *Hart-Bartlett-Sturtevant G. Co.* v. *Commissioner*, 182 F. 2d 153 (C.A. 8, 1950), affirming 12 T.C. 760 (1949).

The tax treatment to be accorded these expenditures in the year in which the experiments were abandoned and the partnership dissolved is beyond the pale of this discussion since we do not have before us the year (1959) in which such dissolution occurred. Cf. *Hart-Bartlett-Sturtevant G. Co.* v. *Commissioner*, supra.

In arriving at the above conclusion we have rejected petitioner's assertion that Argentinian costs incurred by petitioner and attributable to the development and manufacture of Kositerin should also be considered in computing the basis of the Krebiozen raw material to petitioner and the partnership. See sec. 723. Though the preparation and extraction processes used to produce Kositerin and Krebiozen were identical, and though Kositerin was a direct, though fortuitous, outgrowth of Stevan's early work in the field of cancer, the two drugs—like the stimulants used to produce them—were dealt with separately and financed independently. Even though the brothers may at one time have considered distributing Kositerin through a U.S. partnership, we think it clear that this idea was jettisoned as a result of the unencouraging findings made by Northwestern University. Accordingly, since the Kositerin ampules were never used in or contributed to the activities of Duga Illinois, petitioner's argument must be rejected.

Notwithstanding the above, we do find that after January 21, 1950, the Kositerin ampules were a capital asset in Marko's hands, the uninsured destruction of which gave rise to a section 1231 [30] loss in 1956, the year in which spoilage occurred. As we view the January 1950 transaction between Marko and the Duga S.A. investors, Marko received substantially all ownership rights [31] to and possession of the Kositerin ampules subject to any contractual royalties which may have been reserved to Stevan. The ampules were thereafter placed in storage under the supervision of Galmarini. We think the 1953 application to MCI for an increased cost basis, Galmarini's continued supervision and the special trip Marko made to Argentina in 1956 to witness the destruction of the ampules all evidence the fact that Marko held the ampules for the production of income until the time they were actually

---

[30] SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE. * * * For purposes of this subsection—

(1) in determining under this subsection whether gains exceed losses, the gains described therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing taxable income, except that section 1211 shall not apply; and

(2) losses (including losses not compensated for by insurance or otherwise) upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of (A) property used in the trade or business or (B) capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.

Since the loss in question occurred in 1956, the uninsured loss provisions contained in the final sentence of sec. 1231(a) (not shown above) do not apply to the facts of this case. See sec. 1.1231–1(e)·(2), Income Tax Regs.

[31] The agreement between Marko and the Duga S.A. investors indicates that Olga retained a proportional interest in the Kositerin ampules equivalent to her M$N1,000 investment.

destroyed. Accordingly, we cannot agree with respondent that any loss attributable to the Kositerin ampules occurred during an earlier year.[32]

The practical result of our findings (with regard to Kositerin) is that Marko incurred an ordinary loss in 1956 which we value at M$N792,600 ($113,357)—the aggregate of Marko's M$N255,100 ($57,715) investment in 1948 and the M$N537,500 ($55,642) outlay in 1950. (Though deductible as a section 1231 loss in 1956, this amount will not be subject to the 2-year carryback nor the 5-year carryforward provisions of section 172, as provided by section 1.172–4(a)(1)(vi), Income Tax Regs., since the loss was not attributable to a trade or business. Sec. 172(d)(4). See *Garrigo* v. *United States*, 296 F. Supp. 1110, 1114 (N.D. Tex. 1968); and *Mae E. Townend*, 27 T.C. 99 (1956). Nor may we consider the language of section 172(d)(4)(C) (which excludes casualty losses from the trade or business requirement of section 172(d)(4)) since petitioner has failed to introduce any evidence tending to establish that the spoilage was sudden and not the result of a "progressive deterioration [of the ampules] through a steadily operating cause." *Fay* v. *Helvering*, 120 F. 2d 253 (C.A. 2, 1941); *Ray Durden*, 3 T.C. 1 (1944).)

Since we are without proof as to whether Galmarini complied with the January 8, 1954, MCI cost directive in which MCI requested evidence in substantiation of the post-1949 storage and administrative costs claimed by Galmarini in his November 1953 petition, we are unable to augment our M$N792,600 valuation by the amount of these alleged, but unsupported, costs. Additionally, we find no basis for adding to this valuation the 500,000 pesos which were paid by Marko to the Martinis in 1949. Though part of the whirlwind of events in this case, this payment merely represented the gratuitous satisfaction of obligations incurred by Stevan during his early South American research. Cf. *Fromm Laboratories, Inc.,* v. *Commissioner*, 295 F. 2d 726 (1961), affirming a Memorandum Opinion of this Court.

---

[32] We also reject respondent's assertion that the facts underlying Marko's investment in Kositerin (as well as the transaction with Tanoira in which the Krebiozen raw material was obtained) were not sufficiently pleaded to apprise respondent of the nature of petitioner's case. Though, with regard to these transactions, the pleadings filed by petitioner may have lacked specificity, our observation of the parties during the trial of this case, as well as our examination of the numerous interrogatories and motions filed before trial, lead us to believe that respondent was in no way surprised or prejudiced by the testimony and other evidence elicited during the trial in support of these transactions. Since pleadings are but procedural tools which may, in any event, be amended to conform to the evidence adduced, we see no basis, in the absence of surprise or prejudice, for sharing the view of this matter taken by respondent. See *Commissioner v. Finley,* 265 F. 2d 885, 888 (C.A. 10, 1959), affirming a Memorandum Opinion of this Court and cases therein cited.

*Issue 5.   Additions to Tax for Fraud*

We now address ourselves to the question of whether respondent erred in determining that petitioner was fraudulent in failing to pay tax for each of the years in issue.

The existence of fraud is a question of fact. "Fraud" means actual, intentional wrongdoing, i.e., the intent to evade a tax believed to be owing, *Mitchell* v. *Commissioner*, 118 F. 2d 308 (C.A. 5, 1941) ; and, as is wont with fraud cases generally, evidence of fraud must be ascertained from the surrounding facts. *William C. deMille Productions, Inc.*, 30 B.T.A. 826 (1934) ; *M. Rea Gano*, 19 B.T.A. 518 (1930).

To support a determination of fraud for any of the years in question respondent has the burden of proving fraud by "clear and convincing" evidence. *Carter* v. *Campbell*, 264 F. 2d 930 (C.A. 5, 1959) ; *Jacob D. Farber*, 43 T.C. 407, 419 (1965), reaffirmed in a supplemental opinion 44 T.C. 408 (1965). This, we believe, respondent has failed to do.

It has already been established that petitioner failed to file returns for each of the years in point. Though, as respondent points out, such failure does give rise to an inference of fraud, *Nathan Bilsky*, 31 T.C. 35 (1958), it is not alone sufficient to meet the clear and convincing evidence test. *John Marinzulich*, 31 T.C. 487, 490 (1958). *Anderson* v. *Commissioner*, 250 F. 2d 242, 243 (C.A. 5, 1957). Moreover, in the instant proceeding, we do not think it proper to attach an inference of fraud to petitioner's failure to file. Instead we see a pattern of good-faith reliance on petitioner's legal and tax advisers, who saw no necessity for filing in view of the large partnership losses which they determined. Granted, much of the information placed at their disposal related to transactions which took place in Argentina. However, we are convinced (and the various documents introduced into evidence support our conviction) that the disclosures made to petitioner's advisers fairly and honestly reflected petitioner's out-of-pocket, economic experience while in South America. Cf. *Merritt* v. *Commissioner*, 301 F. 2d 484, 487 (C.A. 5, 1962). That the tax treatment accorded these expenditures by petitioner's advisers did not comport with what was required is surely not evidence of fraud on the part of petitioner.

The loss, in 1956, of certain records which respondent regards as being central to petitioner's case has been adequately and credibly explained by petitioner and corroborated by the interrogatories of two witnesses. Under such instances, even if we were to agree with respondent as to the essential character of these records, we would not feel justified in attaching any adverse importance to their loss. Cf. *Lillian Kilpatrick*, 22 T.C. 446 (1954), affd. 227 F. 2d 240 (C.A. 5, 1955).

The withdrawal in 1951 of Ivy's requests for revenue rulings adds lit-

tle to respondent's argument. The ruling requests were made at a time when petitioner and his brother were more preoccupied with establishing a center, the Institute, for the treatment of cancer, than with establishing their tax status. Moreover, the duration of their stay in this country was, at best, uncertain. As stated in the documentation referred to extensively in our Findings of Fact, any effort to leave the country in quest of the Argentinian cost records requested by respondent, could very well have subjected the brothers and, therefore, the Institute to considerable difficulty. Their reluctance to chance this possibility was, in our estimation, reasonable.

Finally, we are told by respondent that petitioner's failure to call Stevan as a witness raises an inference of fraud, *Steiner* v. *Commissioner*, 350 F. 2d 217 (C.A. 7, 1965). Though we acknowledge that the unexplained failure to call a witness, whose testimony might reasonably be expected to favor the taxpayer, does raise an adverse inference, it is questionable whether, in this case, Stevan's testimony could have shaken loose any evidentiary stones not already overturned. In any event, our very careful consideration of the entire record of this case, *Frank Imburgia*, 22 T.C. 1002, 1014 (1954), leads us to the firm conclusion that at no time during any of the years in question did petitioner intend to defraud the Government by failing to pay tax. Marko, though sometimes excitable, was at all times a credible witness. Most of the transactions and occurrences of which he spoke, and which respondent now contests, were amply supported by extensive documentation. In all, the transcript, the interrogatories and the exhibits reveal hardly a clue of fraud. Accordingly, we hold that respondent erred in determining additions to tax under section 6653(b).

*Issue 6.    Additions to Tax for Failure to File Timely Declaration of Estimated Tax (1954) and for Underpayment of Estimated Tax (1955 Through 1958)*

### A.    1954

Section 294(d)(1)(A) of the Internal Revenue Code of 1939, which applies to all years beginning before January 1, 1955 (sec. 6654 (h)), provides, in part, as follows:

(A) Failure to File Declaration.—In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. * * *

Since there is no evidence that petitioner filed a declaration of estimated tax at any time during 1954, the only question raised by section 294(d)(1)(A) is whether petitioner's failure to file was due to reasonable cause. We think such reasonable cause did, in fact, exist.

Where a taxpayer exercises ordinary business care and prudence, his failure to file a declaration of estimated tax, pursuant to section 294(d)(1)(A), within the prescribed time will not be deemed negligent. *George S. Van Schaick, Supt. of Insurance*, 32 B.T.A. 736, 744 (1935). When warranted, reliance on a certified public accountant or an attorney will constitute ordinary care and prudence. *Estate of H. B. Hundley*, 52 T.C. 495, 514 (1969). In the instant case petitioner relied on the tax expertise of accountant Grauer. Since to our knowledge petitioner had not prior to 1954 had occasion to file returns for United States income, petitioner's reliance upon Grauer was both reasonable and prudent. Cf. *Estate of Henry P. Lammerts*, 54 T.C. 420 (1970). The mere fact that, according to the conclusions reached by us in this proceeding, Grauer was incorrect in concluding that petitioner would not have to pay tax in 1954, and that a declaration of estimated tax would, therefore, not be required, is not fatal to petitioner. *Brooklyn & Richmond Ferry Co.*, 9 T.C. 865, 877 (1947). Petitioner's good-faith disclosure to his accountant, who was in all respects well qualified, and who was aware of petitioner's reliance, was, in our judgment, all that was required. Compare *Rene R. Bouche*, 18 T.C. 144, 149 (1952) (reliance not sufficient where accountant not competent).

## B. 1955–1958

The additions to tax, as determined by respondent, for underpayment of estimated taxes during the years 1955 through 1958 is governed by section 6654.[33] As we said in *Estate of Barney Ruben*, 33 T.C. 1071, 1072 (1960), "This section has no provision relating to reasonable cause and lack of willful neglect. It is mandatory and extenuating circumstances are irrelevant." Only if petitioner shows that his case comes within one of the exceptions provided in subsection (d) can he be excused from payment of a penalty under section 6654. *John P. Reaver*, 42 T.C. 72 (1964). This he has not shown and (to the extent now applicable) respondent's determination may not, therefore, be overturned.

---

[33] SEC. 6654. FAILURE BY INDIVIDUAL TO PAY ESTIMATED INCOME TAX.

(a) ADDITION TO THE TAX.—In the case of any underpayment of estimated tax by an individual, except as provided in subsection (d), there shall be added to the tax under chapter 1 for the taxable year an amount determined at the rate of 6 percent per annum upon the amount of the underpayment (determined under subsection (b)) for the period of the underpayment (determined under subsection (c)).

## *Issue 7. Denial of Election to File Joint Returns*

On March 10, 1965, petitioner and his wife filed joint returns on Form 1040 for each of the years 1954 through 1958. The final question for our consideration is whether the election to file a joint return was proper in light of respondent's antecedent statutory notice in which individual rates were employed in determining petitioner's deficiency.

Though several cases have touched upon this issue and have held for respondent,[34] the specific question presented has not been considered by this Court with regard to tax years covered by section 6013(b),[35] or its progenitor, section 51(g) of the Internal Revenue Code of 1939 (applicable to years beginning after December 31, 1950).

Section 6013(b),[36] as originally contained in the Revenue Act of 1951, was enacted to remedy the dilemma which often befell married taxpayers who were required to make a binding election (regarding the type of return they would file) at a time when they lacked "informed tax knowledge not possessed by the average person." S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 458, 492. Accordingly, with certain exceptions, section 6013(b) and its Revenue Act of 1951 analog permit married persons, who originally elect to file individual returns, to later change their election and file joint returns at any time within the 3-year period of the statute of limitations.

In the instant case, petitioner and his wife did not file joint returns for the years 1954 through 1958 until March 10, 1965. Clearly, there-

---

[34] See *Max Dritz*, T.C. Memo. 1969–175, presently on appeal, (joint rates not available where putative election made in pleadings, no returns having been filed) ; *Joseph A. Mundy*, T.C. Memo. 1955–270 (assertion of individual rates by respondent upheld where no returns filed).

[35] In *Estate of Samuel Grobart*, T.C. Memo. 1961–128 (considered extensively by both parties), a case dealing with two pre-1951 years, we held that petitioner and his wife were not entitled to elect joint rates for the years 1948 and 1949 since their returns for these years had been filed subsequent to respondent's notice of deficiency in 1957, in which individual rates had been used to compute tax.

[36] SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.

(b) JOINT RETURN AFTER FILING SEPARATE RETURN.—

(1) IN GENERAL.—Except as provided in paragraph (2), if an individual has filed a separate return for a taxable year for which a joint return could have been made by him and his spouse under subsection (a) and the time prescribed by law for filing the return for such taxable year has expired, such individual and his spouse may nevertheless make a joint return for such taxable year. A joint return filed by the husband and wife under this subsection shall constitute the return of the husband and wife for such taxable year, and all payments, credits, refunds, or other repayments made or allowed with respect to the separate return of either spouse for such taxable year shall be taken into account in determining the extent to which the tax based upon the joint return has been paid. * * *

(2) LIMITATIONS FOR MAKING OF ELECTION.—The election provided for in paragraph (1) may not be made—

\* \* \* \* \* \* \*

(B) after the expiration of 3 years from the last date prescribed by law for filing the return for such taxable year (determined without regard to any extension of time granted to either spouse) ; * * *

fore, had they originally filed individual returns for these years, their election in 1965 to file joint returns would have been untimely. We see no reason why the same rule should not obtain where, as here, no returns were originally filed. However, we need not premise our decision on this fact alone since, in our estimation, the administrative considerations which accompany a system such as ours, where taxation is based upon voluntary disclosure, demand that where, "as the result of a failure to file a return, the Commissioner has been required to make an election for the taxpayers * * * that election may not thereafter be altered." *Spanos* v. *United States*, 212 F. Supp. 861, 864 (D. Md. 1963), reversed in part by 323 F. 2d 108 (C.A. 4, 1963), but affirmed as to matters relevant to the language quoted. See also cases discussed therein. Accordingly, we believe this issue must be decided in favor of respondent.

*Decision will be entered under Rule 50.*